**NATIONAL LABOR RELATIONS BOARD, Plaintiff-Appellee,**

v.

**Karl ROHLEN, as President of Crane Packing Company, and Crane Packing Company, Defendants-Appellants.**

**No. 16096.**

United States Court of Appeals
Seventh Circuit.

Nov. 3, 1967.

John Harrington, Albert J. Smith, Theophil C. Kammholz, Richard H. Schnadig, Chicago, Ill., for defendants-appellants, Vedder, Price, Kaufman & Kammholz, Fyffe & Clarke, Chicago, Ill., of counsel.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Solomon I. Hirsh, Atty., National Labor Relations Board, Washington, D. C., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marion Griffin, Atty., National Labor Relations Board, Washington, D. C., for appellee.

Harold A. Katz, Irving M. Friedman, Chicago, Ill., amicus curiae on behalf of the Union, Stephen I. Schlossberg, Detroit, Mich., of counsel.

Before HASTINGS, Chief Judge, and CASTLE and SWYGERT, Circuit Judges.

SWYGERT, Circuit Judge.

This case presents two principal questions bearing on representation elections conducted by the National Labor Relations Board. The first and underlying question is whether an election rule, promulgated by the Board in Excelsior Underwear, Inc., 156 N.L.R.B. 1236 (1966), was a valid exercise of the Board's statutory authority. The new rule requires an employer to furnish to the Board's Regional Director, prior to a representation election, a list of names and addresses of the employees eligible to vote in the election, after which the Regional Director must make the list available to all parties to the proceeding. The second question is whether a federal district court, pursuant to section 11(2) of the National Labor Relations Act, 29 U.S.C. § 161(2), may enforce a Board-issued subpoena directing the employer to produce the list of names and addresses required by the *Excelsior* rule.

Crane Packing Company operates a plant at Morton Grove, Illinois. On April 13, 1966 the UAW (International Union United Automobile, Aerospace and Agricultural Implement Workers of America, AFL-CIO) filed a petition, pursuant to section 9(c) (1) of the National Labor Relations Act, 29 U.S.C. § 159(c) (1), seeking to represent the plant's production and maintenance employees. The IAM (District 8, International Association of Machinists and Aerospace Workers, AFL-CIO) intervened in the representation proceeding. On April 26, 1966 the company and the two unions signed a "Stipulation for Certification upon Consent Election," which was approved by the Board's Regional Director. The

stipulation provided for a consent election in accordance with the Act, "the Board's Rules and Regulations, and the applicable procedures and policies of the Board." Before signing the stipulation, the company refused to give any assurance of compliance with the *Excelsior* election rule. Nonetheless, the Regional Director informed the parties that he was approving the stipulation subject to the rule's requirement that the company file within seven days a list of the names and addresses of all employees eligible to vote in the election.

Although refusing to file the required employee list before the election, the company permitted leaflet distribution outside the plant and distribution inside the plant by employees in time clock areas. At the same time, the company used its records to mail campaign material to its employees' homes. Two days before the election, the company permitted the UAW to examine a list of the employees' names without their addresses.

Both unions were defeated in the election, after which the UAW filed timely objections, based in part upon the company's refusal to comply with *Excelsior*. After investigation, the Regional Director recommended that the election be set aside because of the noncompliance with *Excelsior*. The Board approved the recommendation, ordered the election set aside *in accordance with Excelsior*, and directed that a second election be conducted in compliance with the rule in that case.

When the company remained adamant in refusing to comply with *Excelsior*, the Regional Director postponed the second election and caused subpoenas *ad testificandum* and *duces tecum* to be served upon the president of the company. The subpoenas directed him to appear at the Board's Regional Office to give testimony in the pending representation proceeding and to produce company records containing the names and addresses of the employees eligible to vote in the election or, in the alternative, to file a list of the eligible voters and their addresses with the Regional Director. The president still refused to comply, and the Board then filed a complaint in the district court for the enforcement of the subpoenas or, alternatively, for a mandatory injunction directing the company to comply with the *Excelsior* rule. Jurisdiction was predicated on section 11(2) of the Act and on 28 U.S.C. § 1337. The district court entered a judgment granting enforcement of the Board's subpoenas on the former theory, from which the defendant appealed.[1]

## I.

### THE VALIDITY OF THE EXCELSIOR RULE

The Supreme Court in two cases, Endicott Johnson Corp. v. Perkins, 317 U.S. 501, 63 S.Ct. 339, 87 L.Ed. 424 (1943), and Oklahoma Press Publishing Co. v. Walling, 327 U.S. 186, 66 S.Ct. 494, 90 L.Ed. 614 (1946), set forth the standards governing judicial enforcement of administrative subpoenas. Duly issued subpoenas are to be enforced if the agency is seeking information "not plainly incompetent or irrelevant to any lawful purpose." Endicott Johnson Corp. v. Perkins, supra, 317 U.S. at 509, 63 S.Ct. at 343. We must therefore initially determine whether the list of employees' names and addresses sought by the Board was for a lawfully authorized purpose. This determination, in turn, necessitates that we resolve the question which has been implicitly raised and explicity argued concerning the validity of the Board's rule promulgated in the *Excelsior* decision.

At an early stage in the judicial interpretation of the Board's powers under the Act, the Supreme Court said, "The control of the election proceeding, and the determination of the steps necessary to conduct that election fairly [are] matters which Congress entrusted to the Board alone." NLRB v. Waterman Steamship Corp., 309 U.S. 206, 226, 60 S.Ct. 493, 503, 84 L.Ed. 704 (1940). Pursuant to that trust, the Board pro-

---

1. The district judge's memorandum opinion appears in 274 F.Supp. 715 (N.D.Ill.1967).

mulgated the *Excelsior* rule. The two-pronged purpose of the rule is to make certain that employees are able to exercise an informed and reasoned choice after hearing all sides of the question concerning the desirability of union representation and to eliminate the time-consuming process of investigating challenges to voter eligibility on the eve of elections solely because of a lack of knowledge of voters' identity.

The company has advanced a number of contentions in attacking the Board's exercise, as exemplified in *Excelsior* of its extensive power to control representation elections. We find little new in the company's attack which has not already been carefully and exhaustively considered and rejected by the Board in *Excelsior* decision.[2] Therefore, we see no necessity to repeat the Board's well articulated rebuttal which is more than adequate to dispose of the company's contentions.

That the Board waited nearly thirty years to conceive and implement this new rule should not militate against its validity. The need for an *Excelsior* rule, aimed primarily at insuring that em-ployee choice is made after full exposure to competing views, has become all the more important because of court decisions which have limited to some extent a union's access to employees during organizational campaigns.[3]

■ We are aware of the Supreme Court's admonition in American Ship Building Co. v. NLRB, 380 U.S. 300, 318, 85 S.Ct. 955, 967, 13 L.Ed.2d 855 (1965), that "[t]he deference owed to an expert tribunal cannot be allowed to slip into a judicial inertia which results in the unauthorized assumption by an agency of major policy decisions properly made by Congress." The *Excelsior* decision, however, represents what we believe to be a sound and equitable policy well within the Board's power under the Act.

## II.

### THE ENFORCEMENT OF THE SUBPOENAS TO OBTAIN AN EXCELSIOR LIST

■ The company contends that the district court lacked jurisdiction to enforce the subpoenas under section 11(2) of the Act because the subpoenas were not issued in compliance with section 11(1) of the Act.[4] The essential require-

---

2. The only contention of the company not explicitly raised in *Excelsior* is the claim that the rule interferes with a significant employer interest, that is, protecting the composition of his work force from outside interference. Such interference might arise, according to the company, through a disclosure by the union of the employee list to competitors of the employer or through efforts by an unsuccessful union to place employees in a union shop.

These objections are without substance. Nothing in the record supports the argument that disclosing the names and addresses of employees will in the future or has in the past resulted in piracy. A union that is bent on engaging in such unconscionable practices will surely not be deterred by the unavailability of an *Excelsior* list. And as the Board stated in a different context, equally relevant to employee piracy, "We cannot assume that a union, * * * will engage in conduct of this nature; if it does, we shall provide an appropriate remedy."

3. See e. g., NLRB v. United Steelworkers of America, 357 U.S. 357, 78 S.Ct. 1268,

2 L.Ed.2d 1383 (1958); NLRB v. Babcock & Wilcox Co., 351 U.S. 105, 76 S.Ct. 679, 100 L.Ed. 975 (1956); May Department Stores Co. v. NLRB, 316 F.2d 797 (6th Cir. 1963).

4. Section 11 of the Act, 29 U.S.C. § 161, in relevant part, reads:
   For the purpose of all hearings and investigations, which, in the opinion of the Board, are necessary and proper for the exercise of the powers vested in it by sections 159 [certification of employee representatives] and [section] 160 [prevention of unfair labor practices]—
   
   *　*　*　*　*
   
   (1) The Board, or its duly authorized agents or agencies, shall at all reasonable times have access to, for the purpose of examination, and the right to copy any evidence of any person being investigated or proceeded against that relates to any matter under investigation or in question. The Board, or any member thereof, shall upon application of any party to such proceedings, forthwith issue to such party subpenas requiring the attendance and testimony of witnesses or the production of any

ment for both the issuance and enforcement of a Board subpoena is that the production of the evidence or the giving of the testimony called for by the subpoena must relate to a "matter under investigation or in question." The defendants maintain that efforts to obtain an *Excelsior* list by means of a subpoena under section 11(1) was improper for two reasons: (1) since all questions were resolved by the execution of the consent election agreement, there was no matter under investigation to which the subpoenas were relevant; (2) since the list of employee names and addresses was to be passed on to the unions, the information requested by the subpoenas was not intended for any evidentiary purpose. These objections stem from an overly narrow interpretation of the statute and for that reason must be rejected.

The company's first claim that a consent election somehow eliminates all matters "under investigation or in question" does not withstand close scrutiny for two reasons. First, the prefatory words of section 11 indicate that the Board's subpoena power and a court's enforcement power extend to "all hearings and investigations, which, *in the opinion of*

*the Board,* are necessary and proper for the exercise of the powers vested in it by sections 159[9] and 160[10]." (Emphasis added.) This language suggests, contrary to the company's contention, that in formulating section 11 Congress did not envision a narrowly confined use by the Board of its subpoena powers. As the preamble to the section demonstrates, Congress desired that the Board have a substantial amount of discretion in determining the necessity and propriety of investigations in the aid of which subpoenas might issue, pursuant to the exercise of sections 9 and 10 powers.[5]

Second, a consideration of the full scope of section 9 also serves to undermine the company's contention regarding the effect of consent elections on the extent of the Board's subpoena powers.[6] Section 9 provides that when a petition is filed alleging a desire or demand for representation, "the Board shall investigate such petition" prior to ordering an election. Cases construing that section indicate that the prescribed procedure, from commencement to completion, for determining whether a union will be certified as a collective bargaining representative is an investigation.[7] Though a

---

evidence in such proceeding or investigation requested in such application. * * *

    (2) In case of contumacy or refusal to obey a subpena issued to any person, any district court of the United States * * * within the jurisdiction of which the inquiry is carried on or within the jurisdiction of which said person guilty of contumacy or refusal to obey is found or resides or transacts business, upon application by the Board shall have jurisdiction to issue to such person an order requiring such person to appear before the Board, its member, agent, or agency, there to produce evidence if so ordered, or there to give testimony touching the matter under investigation or in question; * * *

5. See, I LEGISLATIVE HISTORY OF THE NATIONAL LABOR RELATIONS ACT 1935, 1367 (1949); II Id., at 2932.

6. In the instant case a "Stipulation for Certification Upon Consent Election" was entered into between the company and the unions in accordance with section 9(c)

(4) of the Act and the Board's rules. Pursuant to the stipulation, the parties agreed to the following: a secret ballot, the eligible voters, notices of election, observers, tally of ballots, post-election and run-off procedure, the record, the commerce impact, wording on the ballot, payroll period of eligibility, date, hours, and place of election, the appropriate collective bargaining unit, and the waiver of a a representation hearing.

7. In Kearney & Trecker Corp. v. NLRB, 209 F.2d 782 (7th Cir. 1953), this court considered in some detail the meaning of section 9 and the reference to "investigation" contained therein. The case concerned an unfair labor practice growing out of a refusal to bargain. The company argued that its refusal to bargain was in part justified because of the Board's improper investigation prior to certification of the union. The company's contention centered around the proposition that the record of the "investigation" conducted by the Board pursuant to section 9(c) was incomplete. Although rejecting the company's position, we said, "It appears

consent election agreement obviates the determination of some of the questions entailed in the process of determining whether to certify a bargaining representative, such an agreement by no means eliminates all matters under investigation or in question. For the employment of an *Excelsior* list is aimed at resolving an issue much more crucial and pervasive than the relatively less important ministerial election matters disposed of by the consent agreement. As indicated previously, the availability of the employee list to all parties is essential to the prompt and enlightened determination of the central issue under investigation or in question during the entire section 9 proceeding, that is, whether any union will be certified as a collective bargaining representative pursuant to a free and fair election.

▇ Thus the proper view of the scope of the investigatory powers of the Board is that the Board's investigation commences upon the filing of the petition for certification and ends when the results of the election are fully and finally determined. Since the *Excelsior* list can be used to insure a fully informed electorate, a key aim of a section 9 "investigation" which a consent election agreement is not designed to accomplish, the use and enforcement of a subpoena to obtain an *Excelsior* list under section 11 is entirely appropriate. We conclude that the consent election agreement did not divest the district court of jurisdiction under section 11(2) to enforce the Board's subpoena issued under section 11(1).

The company's second claim that the district court lacked jurisdiction under section 11(2) to enforce the Board's subpoenas is predicated on the statutory provision that the person subpoenaed must either produce "evidence" or give "testi-

mony." The contention made is that since the *Excelsior* list is not used by the Board to prove or disprove a disputed fact or issue but rather is merely furnished to all parties to the proceeding, the list serves no "evidentiary" purpose within the meaning of section 11(2).

▇ Section 11(2) itself reveals the erroneous nature of the company's contention. The crucial words in that section are "to produce evidence * * * or * * * give testimony touching the matter under investigation or in question." From this language, it is clear that a party can be requested, by virtue of a subpoena, "to produce evidence" concerning a "matter under investigation." When this rather obvious observation is coupled with the commonly accepted function of an investigation, the gathering of facts and information, the company's position becomes untenable. The company would read the words just quoted without the phrase "under investigation." A more appropriate reading would place primary emphasis on those words. Thus, if the material subpoenaed touches a matter under investigation, it is within the scope of section 11(2) even though the material may not be considered "evidence" as the term is employed in the courtroom.

Moreover, the list of employee names and addresses is evidence relating to a "matter * * * in question." Even if we adopt the orthodox view that evidence tends to prove or disprove the existence of a disputed fact or something in issue, the "something in issue" in a representation proceeding under section 9 is the employee group-preference. An *Excelsior* list, by facilitating a fully informed electorate, is evidence which aids in the establishment of that group-preference.

* * * that each step taken under 9 ⁀(c) has been referred to as a part of the investigation; in fact, the Board in its Statements of Procedure * * * refers to the hearing therein provided as 'part of the investigation'." Id. at 786. Moreover, in Inland Empire District Council, etc. v. Millis, 325 U.S. 697, 707, 65 S.Ct.

1316, 89 L.Ed. 1877 (1945), a case decided prior to the Taft-Hartley amendments of 1947, the Supreme Court stated that, "A direction of election is but an intermediate step in the investigation, with certification as the final and effective action."

In an effort to add support to the contention regarding evidence, the company relies on FTC v. American Tobacco Co., 264 U.S. 298, 44 S.Ct. 336, 68 L.Ed. 696 (1924). The company would apparently have us read *American Tobacco* as standing for the proposition that the purpose for which the agency there sought to compel the production of the records put those records beyond the technical definition of the term "evidence." The Court in that case sustained a refusal to grant a writ of mandamus seeking production of books and records because the request was excessively broad. Consequently, a more appropriate reading of the case suggests that the records requested were "evidence," but that their relevancy and materiality to the issue in question were not adequately demonstrated.[8] As we previously pointed out, no such attack on the *Excelsior* list can be sustained.

We hold that the enforcement by the district court of the Board's subpoena to obtain an *Excelsior* list was proper under section 11(2) in that the list touched a matter under investigation or in question and was evidence. This conclusion makes unnecessary a consideration of the Board's alternative theory that the

district court had jurisdiction to enforce compliance with the subpoenas under 28 U.S.C. § 1337.[9]

The order of the district court is affirmed.

---

8. Our reading of *American Tobacco* is confirmed by later cases, such as United States v. Morton Salt Co., 338 U.S. 632, 652, 70 S.Ct. 357, 94 L.Ed. 401 (1950), and United States v. Powell, 379 U.S. 48, 85 S.Ct. 248, 13 L.Ed.2d 112 (1964), which adopt a more permissive view of the scope of an administrative agency's powers than that contained in *American Tobacco*. These later cases reflect the Court's recognition of the need to avoid a narrow reading of the powers vested in administrative agencies by Congress so as not to disable them from effectively performing their statutory functions. Thus in *Powell*, concerning the breadth of the investigatory powers of the Commissioner of Internal Revenue, the Court said, "Although a more stringent interpretation [of the statute] is possible, * * * we reject such an interpretation because it might seriously hamper the Commissioner in carrying out investigations he thinks warranted, forcing him to litigate and prosecute appeals on the very subject which he desires to investigate * * *." Id. 379 at 53, 54, 85 S. Ct. at 253.

Moreover, the legislative history accompanying the enactment of the provision relating to the Board's subpoena powers refers specifically to the interpretation given the phrase "documentary evidence" in *American Tobacco*. That interpretation prompted Congress to substitute the word "evidence" for the phrase "documentary evidence." I LEGISLATIVE HISTORY OF THE NATIONAL LABOR RELATIONS ACT 1935, 1369 (1949).

9. The Court of Appeals for the Fourth Circuit reached a similar result as to the enforceability of a Board subpoena to obtain an *Excelsior* list in NLRB v. Hanes Hosiery Div.—Hanes Corp., 384 F.2d 188 (4th Cir. Oct. 3, 1967). The Fourth Circuit, however, rested jurisdiction alternatively on section 11(2) and 28 U.S.C. § 1337.