**P. R. MALLORY & CO., Inc., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 16051.**

United States Court of Appeals
Seventh Circuit.
Dec. 26, 1967.

Frederic D. Anderson, Herbert C. Snyder, Jr., Indianapolis, Ind., for petitioner, Barnes, Hickam, Pantzer & Boyd, Indianapolis, Ind., of counsel.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Harold B. Shore, Atty., N.L.R.B., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Lawrence M. Joseph, Atty., N.L.R.B., Washington, D. C., for respondent.

Before SCHNACKENBERG, Circuit Judge, KNOCH, Senior Circuit Judge, and SWYGERT, Circuit Judge.

SWYGERT, Circuit Judge.

Mallory Capacitor Company, a division of P. R. Mallory & Co., operates a manufacturing plant at Glasgow, Kentucky. On February 1, 1967 the National Labor Relations Board issued an order requiring the petitioner to refrain from committing certain unfair labor practices and to reinstate two discharged employees with back pay.

The Board found that, in violation of section 8(a) (1) of the National Labor Relations Act, the company interfered with its employees in the exercise of their section 7 rights by threatening them with adverse economic consequences if they selected the IUE (International Union of Electrical, Radio and Machine Workers, AFL–CIO) as their collective bargaining representative. These purported threats were contained in several letters sent to the employees prior to a representation election which was held in May, 1966. The Board also found that the company violated section 8(a) (1) by maintaining a shop rule that in effect prohibited employees from engaging during nonworking time in either union solicitation on company property or union literature distribution in nonworking areas. Additionally, the Board found that the company violated section 8(a) (3) and (1) by discharging employees Betty Davis and Charles Judd because of their activities in behalf of the union. The petitioner Mallory seeks to set aside this order; the Board cross-petitions for its enforcement.

I.

### THE COMPANY LETTERS TO THE EMPLOYEES

On four different occasions between January 11 and March 2, 1966, the company sent letters to its employees urging them to reject the union in the impending election. The trial examiner found that the letter of February 16 was "not violative as charged in the complaint," and he did not mention the February 7 letter in his decision. But, after quoting from the January and March letters, the examiner determined that the company's "barrage of letters before the election was a none too subtle threat that to accept the union meant to destroy employees' job security." [1] The examiner continued: "I do not know any way the message could be made more clear. Respondent [the company] told the employees in so many words, * * that the work of making capacitors was taken by respondent from the Indianapolis plant and that it resulted from the union activities in that plant."

Although the rules for determining whether employer communications are protected by section 8(c) or are violative of section 8(a) (1) have often been stated, every case requires a careful balancing to ascertain on which side of the line a given communication falls. Thus we have held that an employer may not suggest that if his employees vote in favor of union organization, he will retaliate by making economic decisions adversely affecting their interest. Wausau Steel Corp. v. NLRB, 377 F.2d 369 (7th Cir. 1967). But an employer does not commit an unfair la-

---

1. The relevant portions of the letters are contained in the appendix.

bor practice by expressing an opinion or even a prediction that dire economic consequences will befall his employees if they choose a union to represent them. NLRB v. S. & H. Grossinger's, Inc., 372 F.2d 26 (2d Cir. 1967); Amalgamated Clothing Workers v. NLRB, 124 U.S. App.D.C. 365, 365 F.2d 898 (1966). Thus the determination whether an employer's statement to his employees during an organizational campaign is a direct or subtle threat of employer reprisal or is instead a prognostication of disastrous consequences, which the union and not the employer will bring about, raises the threshold question as to the existence of a section 8(a) (1) violation. Sometimes this determination can be made by looking at the questioned statements alone. At other times, as in the instant case, the questioned statements do not of themselves clearly indicate whether they are protected or proscribed. In such situations, the statements must be considered in light of the totality of employer communications. Under the test just advanced, if a statement cannot be interpreted as a subtle suggestion that the employer will seek to thwart unionization by visiting economic disadvantage upon his employees, but rather that such consequences may result from unionization itself, the statement is immune from the statutory ban.[2]

 In the case at bar, the accused portions of the letters do not contain direct employer threats of reprisal. Therefore, we must consider them in their totality to determine whether they contain indirect threats. When thus viewed, we believe that the letters sent by the company to its employees were within the protection of section 8(c) of the Act. A fair reading of these communications does not suggest that if the union was successful, the company would of its own volition transfer work from its plant in Glasgow to some other plant. Nor was the company predicting adverse economic consequences which were within its power to initiate if the employees voted for the union. The company had a right to state its opinion about the potential effects upon its customers if costs were increased as a result of granting union demands for increased wages and other benefits, thus compelling higher prices for its product. Similarly, the company had a right to speculate about the consequences of a strike called if the company refused to meet union demands. In this regard, the company could opine that while its employees were on strike, it would not be making capacitors, resulting in a permanent loss of customers. Finally, the company had the right to support its opinions by citing past experiences with the same union in other plants which the company operated. Consequently, the Board's conclusion that the campaign letters sent by the company violated section 8(a) (1) is not supported by substantial evidence on the record considered as a whole.[3] In reaching this conclusion, we are in agreement with the Second Circuit's statement in NLRB v. River Togs, Inc., 382 F.2d 198, 202 (2d Cir. 1967):

> Although the Board apparently thinks workers should be shielded from such

2. Under the test set forth in the text, so long as an employer's predictions relate to consequences likely to occur due to union activity, he may properly base his opinions on past events or personal experience if such are truthfully depicted.

3. The necessity to carefully scrutinize a Board allegation that employer campaign literature violates section 8(a) (1) becomes more urgent in light of our recent decision in NLRB v. Rohlen, 385 F.2d 52 (7th Cir. Nov. 3, 1967). That case upheld the validity of the Board's *Excelsior* rule requiring an employer to make available to the parties to a representation proceeding a list of the names and addresses of all employees eligible to vote. If, as we stated in *Rohlen*, "employees are * * * to exercise an informed and reasoned choice after hearing all sides of the question concerning the desirability of union representation," then we must guard against the Board adopting an overly restrictive attitude toward permissible employer communications.

disconcerting information, an employer is free to tell his employees what he reasonably believes will be the likely economic consequences of unionization that are outside his control, as distinguished from threats of economic reprisal to be taken solely on his own volition. * * * If § 8(c) does not permit an employer to counter promises of pie in the sky with reasonable warnings that the pie may be a mirage, it would indeed keep Congress' word of promise to the ear but break it to the hope.

## II.

### THE DISCHARGES OF DAVIS AND JUDD

On February 11, 1966 the company discharged employees Betty Davis and Charles Judd. Davis had originally been hired in the latter part of September 1965, and she had worked until about the middle of December 1965 at which time she left voluntarily. She was re-hired on January 25, 1966. Of the following fourteen working days, she was absent five. Judd was hired on December 6, 1965. Between that date and his discharge he was absent eight days. Davis' and Judd's absenteeism amounted to 35.7 per cent and 16 per cent of their respective possible working time. Both Davis and Judd had signed union cards and each was a member of the IUE local organizing committee. Knowledge of their membership came to the company's attention on February 7, 1966 when the union sent the company a letter saying, "This letter is to advise you that the following people are serving on the IUE-AFL-CIO voluntary organizing Committee." The nineteen names listed included Davis and Judd.

In response to the Board's claim that the discharges were motivated by union animus, the plant manager, Wayne Ruggles, testified that Davis and Judd were dismissed for absenteeism. He said that on February 11, the date of the discharges, he conferred with three executives from the company's Indianapolis headquarters about the Glasgow plant's production problems; that they suggested he review the records to ascertain the "rates of absenteeism" during the "past 30 days or so." He further testified that Davis' and Judd's records were brought to his attention, and because of their poor attendance, he decided to discharge them, "to try to point out to the other people in the plant in this department [660] the importance of * * * being at work all the time."

Evidence was introduced showing that during the thirty-day period prior to February 11 at least four employees in department 660 were absent from work more than either Davis or Judd. (The Board emphasized this evidence in concluding that Davis' and Judd's discharges were in fact motivated because of their union activity.) Yet one of these four employees was also a member of the union organizing committee, and his name was included in the letter from the union to the company. In the thirty-day period, that employee was absent sixteen days. If the company wanted the discharge union sympathizers on the pretext of absenteeism, this employee would have provided a far better choice than Davis or Judd. In addition, an employee in department 681, who was on the union organizing committee, was absent five days during the same period. During the entire month of January, however, she was absent ten days. The Board does not attempt to explain this disparity of treatment of union sympathizers. Nor is there anything in the record to show that Ruggles was aware at the time of the discharges that other employees had a worse absenteeism record than did Davis and Judd. In our opinion, the records of these five employees lead inevitably to the conclusion that absenteeism was the cause of the discharges rather than union activity.

This conclusion is supported by additional evidence. Prior to the discharges of Davis and Judd, eleven other employees were discharged for absenteeism. Of these eleven, two were in department 660, the same department in which Davis and Judd worked. After

the discharges in question, two additional department 660 employees were also discharged for absenteeism. However, none of the names of these other four dischargees were on the list of the union organizing committee sent to the company. Thus the record contains objective evidence corroborating Ruggles' testimony that production problems in department 660 were due to excessive absenteeism and that the discharges were deemed necessary to set examples for other employees in that department.

■■■■■ Although the trial examiner discredited much of Ruggles' testimony, there is no substantial evidence in the record to support the examiner's conclusion, adopted by the Board, that union activity rather than absenteeism was the dominant reason for the discharges of Davis and Judd.[4] We do not agree, as the Board attempts to argue, that the company was obliged to prove that the discharges were for the nondiscriminatory reason assigned. Instead, the Board had the burden of demonstrating that the discharges were motivated for a proscribed purpose. Portable Electric Tools, Inc. v. NLRB, 309 F.2d 423 (7th Cir. 1962). The findings of the Board rested on tenuous inferences. These inferences are not entitled to deference on review when the evidence, as here, considered on the record as a whole, compellingly leads to contrary inferences.

## III.
### THE NO-SOLICITATION, NO-DISTRIBUTION RULE

■■■ Each new employee at the company received a handbook upon commencing work. The booklet, "Your Future at Mallory," contained numerous rules, including one entitled "Outside Business":

> Solicitations, collections of funds, selling among employees, pledges, subscriptions, circulation of petitions, distribution of literature, solicitation of memberships or similar activities are not allowed on company property. Special permission may be granted in certain instances of recognized charities.

In addition the handbook informed the employee, "Your supervisor is required to enforce these rules and to take disciplinary action when necessary." Although the rule did not specifically prohibit union solicitation and literature distribution on company property, a reasonable interpretation of the rule would include such solicitation and distribution regardless of the circumstances under which that activity was conducted.

■■■■ The National Labor Relations Act protects the right of employees during nonworking time both to solicit union membership while on the company premises and to distribute literature in nonworking areas on the company property, unless the employer can demonstrate that unusual circumstances necessitate some restriction of that right in order to maintain production or discipline. NLRB v. Babcock & Wilcox Co., 351 U.S. 105, 76 S.Ct. 679, 100 L.Ed. 975 (1956); Republic Aviation Corp. v. NLRB, 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372 (1945). The burden of showing unusual circumstances justifying a restriction rests upon the employer. Republic Aviation Corp. v. NLRB, supra at 803 n. 10, 65 S.Ct. 982. Since the company did not attempt to justify this potential all-encompassing rule, we believe that the Board properly held that

---

4. The trial examiner pointed out conflicts in Ruggles' testimony as a witness for the General Counsel and as a witness for the company. Although as the examiner indicated, his testimony may have been "less than forthright," the record suggests only that the company maintained sloppy procedures regarding both absenteeism and the selection of those who were going to be discharged. We recognize that the examiner's creditability determinations are entitled to deference on review, but they can only affect the weight of Ruggles' testimony. Those determinations cannot supply the proof necessary to substantiate the General Counsel's claim that the discharges were improperly motivated.

the maintenance of the rule violated section 8(a) (1) of the Act.

Of the several contentions advanced by the company in support of the rule, only one merits any discussion. The company maintains that the letter of February 16 and a May 3 letter to the employees amounted to a company interpretation so as to exclude from the rule's application membership solicitation and literature distribution by union sympathizers.[5]

The May 3 letter was sent immediately after the complaint was filed in this proceeding. That fact alone detracts from any suasion that might otherwise be attributed to the letter as somehow revoking the unambiguous import of the rule against any type of union organizational activity within the plant. Irrespective of the letters' timing, neither of them serves as an amendment so as to render the rule lawful. Furthermore, as the examiner pointed out, the company continued after May 3, 1966 to distribute the handbook unchanged. Thus a new employee who received the handbook would be unaware of the company's asserted amendment of the rule.

The Board's order is in part vacated and in part enforced.

## APPENDIX

The January letter emphasized the fact that if wages were increased by union demands, the company might not be able to compete with other capacitor manufacturers, resulting in a loss of jobs. The letter continued:

"Think also of strife and strikes. Every day you read in the newspaper and you hear on the radio and T-V, of strikes and strife and plant shutdowns and trouble. You never hear of those things in a plant that does not have a union. Every day you hear of unions calling strikes.

You can have a strike here too if you want it. You can sign a union card, vote for the union, demand that the union deliver on their promises, get called out on a strike, and perhaps shut this plant down. During the strike, there would be no pay checks, no fringe benefits, no job security, no jobs.

And when the strike was over, would there be jobs and job security? Once more, that depends on the customer. If somehow the strike settlement led to higher prices, then we would risk losing our customers. But if, after weeks and months of strikes and no pay checks, the union called off the strike on the old terms, what then? Well, that would depend upon whether there were any customers left. We do know that our customers would not go out of business just because the Glasgow plant was on strike. We do know that our competitors would not stop trying to take our business away from us just because the Glasgow plant was on strike. Indeed, the moment our competitors learned that production was interrupted at Glasgow, our competitors would be around to see our customers offering to take care of their needs. And when our customers established relationships with our competitors, and were satisfied with the deliveries and the qualities and the prices of our competitors, could we get them back after the strike? And if we did not, or got only

---

5. The February letter read in relevant part:

Several have complained that their production has been hampered because of threats in trying to force them to sign cards. If you are being threatened or being urged to sign a card during working hours, report it to your foreman immediately. This is against the Company's policy and is grounds for discharge.

The May letter read in relevant part:

* * * [T]he Union complains that the Company has forbidden employees to talk Union and to distribute literature on non-work time. You know that is not true. You know that you, and your fellow employees, have talked for and against the Union freely in the plant. The only rule is that talk cannot interfere with production while you are working, whether it is talk of Union, talk of protecting your individual freedom or talk of baseball.

part of them back, what would you and I do for a living? And what would happen to our job security?

\* \* \* \* \* \*

Perhaps this is because our employees elsewhere know what the experience of Mallory employees with the IUE has been. About 10 years ago, the employees at the Frankfort, Indiana plant voted for the IUE. That union was in that plant for one year. One year was enough. At the end of the year, at the first time they could, the employees organized, got a decertification election from the NLRB, and kicked the IUE out. One IUE strike, one IUE picket line, one taste of IUE violence, and one year of an IUE contract, was more than enough for them.

Several times since, the IUE has tried to get back in at Frankfort. For the plant has grown since then and there are a great many employees and much better jobs. But the employees remember what the IUE was really like, and they reject it flatly.

The IUE has been in the Indianapolis plant for years. Ten years ago, there were almost 4,000 jobs at the Indianapolis plant. The IUE created conditions there which made it economically impossible for the Company to compete. Ten years ago they called a long strike. When the strike was over, there were only half as many jobs. Today there are only 450 jobs in Indianapolis. Over 3,500 jobs have simply disappeared. This is 'IUE job security.'

There was a time when we made capacitors in Indianapolis. We do not anymore.

With this record, we do not know why the IUE is in Glasgow. Perhaps they are here to bring to you what they brought to the employees in Frankfort and in Indianapolis. Or perhaps they are here to create such conditions in Glasgow that they will hope that the Company can be forced to produce capacitors in the Indian-

apolis plant, where they have long-standing members, instead of in the Glasgow plant where they do not.

Whatever their motives are, they are not good news for you or for me.

You are the boss. Under the law, and under company policy, you can do as you please. You can sign or not sign, join or not join, and nobody will be discriminated against in any way because he does or does not. We guarantee this to you, despite anything that the IUE says to the contrary.
\* \* \* "

The March letter read in its entirety:
"March 2, 1966

Dear Fellow Employee:

I hope you read the IUE bulletins. They tell you, more clearly than anyone else can, why you should vote 'No' in an NLRB election.

What they say is that if you vote for the IUE you will get IUE 'protection.' That word tells you a lot.

Let's look at this IUE 'protection.' Let's see what happened to other people who got 'protected.'

Let's look at the record.

First, let us start right at our Frankfort, Indiana plant. Let's see how the IUE 'protected' the people in this plant in 1954.

A small majority of the employees voted for the IUE in an election in that year. They were fooled by talk of 'protection.' They learned to their sorrow what it meant.

After the election, the IUE called a strike. Why did they strike? They struck to force the Company to fire every employee who would not pay dues to the IUE, whether he wanted to or not. They called a strike to get dues money for themselves. Of course, the Company refused to fire anyone for not joining, despite the pressure and losses which the strike brought.

The IUE talks now about 'giving' you 'protection.' In 1954 the employees found out that what the IUE wanted to do was to **sell** them 'pro-

tection' whether they wanted it or not, and that the IUE was willing to force them out of their jobs if they did not want to be 'protected.'

In 1954, the IUE strike lasted over five weeks.

Rather than job protection, there were no jobs.

Rather than wage protection, there were no wages.

What did that IUE 'protection' cost those who were off work? At that time, the average weekly earnings were about $60.00. (That was 12 years ago. Wages are much higher now. There is still **no** union.) For five weeks of strike this would total $300.00.

At the end of the strike, it was settled for the same per hour increase the Company offered before the strike began. It took over seven years to make up the $300.00 loss to each employee that went on strike.

More than half the employees worked through the strike. They did not lose that money. But they paid in another way—they got IUE 'protection' in the form of abuse and violence on the picket line—a cost greater than dollar and cents.

You may ask 'must there be another strike?' If you vote **NO** in the NLRB election, then the answer is 'No, there will not be a strike.' If you vote 'Yes,' we do not know whether you will get that form of IUE 'protection' or not. Only the IUE can decide whether to strike. But the record of the past, both in Frankfort and elsewhere, gives all of us a good idea of the future that the IUE would have in store for you.

Let us look at another side of this IUE 'protection.' Do they give it to you? No, they want to **sell** it to you! Generally the IUE dues are $5.00 per month or $60.00 per year. There are about 500 employees in this plant. At $60.00 each, that is $30,000 a year. That is a big price for you to pay for something which they say they are 'giving' you. It is an even bigger price to pay for strikes, loss of wages and loss of jobs.

That is the Frankfort story. Let us look at the story elsewhere. Let us look at IUE 'protection' in Indianapolis.

On January 1, 1956, there were 3400 hourly-paid Mallory employees in Indianapolis. In January and February, 1956, the IUE conducted a 6-weeks strike. This was more IUE 'protection.' During that 6-weeks strike none of those employees drew any pay checks. The IUE gave 'protection' to those employees and they were 'protected' out of jobs, out of wages, and out on to a cold picket line. Now there are less than 500 hourly-paid jobs at Indianapolis. Under the IUE representation, the jobs of more than 3000 employees in Indianapolis have disappeared. Yet the IUE has the nerve to send you a bulletin talking about 'IUE job protection.' To those 3000 Indianapolis employees, IUE job 'protection' means no jobs. For them IUE 'wage protection' means no pay checks.

The IUE represents the employees in one other Mallory plant. This is the Tarrytown, New York plant. The story is the same as Frankfort and Indianapolis.

The IUE struck the Tarrytown plant in 1957. They remained on strike for 30 days. Thirty days the employees were 'protected' by the same IUE 'protection' plan. 'Protection' for the employees meant no jobs, no wages, no fringes—just 30 days on a cold picket line. This plant had 400 employees in 1960. They have 100 now. Three hundred employees were 'protected' out of jobs.

This IUE 'protection' story is repeated in many places over the country.

You can be protected against IUE protection. But only you can do it. Vote **NO** in the election, and help to protect your pay check, your job, and your freedom from picket line violence."