**P. R. MALLORY & CO., Inc., Petitioner,**

**v.**

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 16665.**

United States Court of Appeals
Seventh Circuit.

Oct. 7, 1968.

Frederic D. Anderson, Herbert C. Snyder, Jr., Barnes, Hickam, Pantzer & Boyd, Indianapolis, Ind., for petitioner.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Joseph A. Yablonski, Atty., N.L.R.B., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, John D. Burgoyne, Atty., N.L.R.B., Washington, D. C., for respondent.

Before DUFFY, Senior Circuit Judge, and SWYGERT and KERNER, Circuit Judges.

DUFFY, Senior Circuit Judge.

This is a petition to review and set aside an order of the National Labor Relations Board[1] (Board) issued against Mallory Capacitor Company, a division of petitioner.

The Board found the Company violated Section 8(a) (3) and (1) of the National Labor Relations Act by discharging employee Darrel B. Van Meter on January 19, 1967, because of his union activities. The Board has cross-petitioned for enforcement.

The issues before us are whether the Board's findings are supported by substantial evidence on the record considered as a whole; whether the Board properly ordered the Company to reinstate Van Meter with full back pay, and whether the Board's order is too broad.

In early 1966, the union[2] began an organizing campaign among the production and maintenance employees of the Company's plant in Glasgow, Kentucky. The Company was strongly opposed to the union.

An election held May 11, 1966 was won by the union by a vote of 253 to 239 with 3 challenged votes. The Board sustained an objection to the election filed by the Company. A new election was ordered. The Company continued to campaign against the union. In the second election, the union lost. The vote was 321 to 317 with 2 void votes and 4 challenged votes.

The union filed objections to the second election and these objections were sustained by the Board. A new election was ordered. This third election was held on November 16, 1967. The union lost by a vote of 257 to 168 with 5 challenged votes. The union did not file objections. The result has been certified by the Board.

Van Meter was first employed by the Company in August 1965 for machine maintenance work at $1.35 per hour. He

1. The Board's decision and order were dated January 9, 1968 and are reported at 169 N.L.R.B. No. 5.

2. International Union of Electrical Radio and Machine Workers, AFL-CIO.

asked for and received a series of wage increases. In December 1965 he received an increase to $1.55 per hour; in April 1966, an increase to $1.65 per hour; in August 1966, he received a ten cent increase to $1.75 per hour, and on November 7, 1966, he received an increase to $1.85 per hour. As far as the record discloses, Van Meter's work was satisfactory to the Company.

A short time after Van Meter was first employed, the Company hired another employee to perform the same kind of work at a higher rate of pay than that of Van Meter. Furthermore, Van Meter was required to instruct the new employee in his work, and Van Meter believed he was thus being treated unfairly by the Company. When he asked for a raise in 1966, Van Meter told his foreman Meador that it was "hard" to support his family, which included four children, on the wages which he was receiving. In January 1967, Van Meter again discussed a raise with his foreman Meador. He asked Meador to "let me know about it, because I was planning on quitting if I didn't get it."

On January 19, 1967, Van Meter reported for work at 4:30 p.m. He was wearing his union button. He noticed that the six machine operators in his department were not wearing their buttons although previously it had been their custom to do so.

After an hour or two of work, foreman Meador announced there was a shortage of material on which to work and that he was going to have to let the boys go home early. Van Meter asked if that meant him also, but Meador told him not necessarily unless he wanted to go home. Van Meter said he did not wish to go home and Meador said that was all right.

On that day, in the factory, Van Meter asked several of the employees why they were not wearing their union buttons. He spoke to three men all of whom put their buttons on. Just after the conversation with employee Fudge who was the third employee with whom he had spoken, Van Meter noticed that foreman Meador was observing him from a distance of from twelve to fifteen feet.

About 7 p.m., on that date and after the conversation with the three employees, Meador called Van Meter into another room of the plant. Van Meter testified it was an "isolated part of the plant." Van Meter testified that Meador said "he understood they turned my raise down and tonight would be a good night for you to quit. * * * I said I would give them two weeks notice when I * * * decided to quit and he said tonight is when you quit and I said you mean right now? An (sic) he said, right now, and then I asked him * * * you mean I don't even get to finish the week up and he said, no. * * *"

Petitioner insists that the Board's finding that Van Meter was discharged by the petitioner is unsupported by the record, and that the evidence shows that Van Meter volunteered to quit his employment when his latest request for a wage increase was denied.

Petitioner strongly urges that the Board's findings and conclusions concerning petitioner's "union animus" was based on a previous decision (162 N.L.R.B. No. 126), where the Board's findings as to "union animus" were set aside by this Court. P. R. Mallory & Co., Inc. v. N.L.R.B., 389 F.2d 704. Petitioner also urges that the claim that the Company discharged Van Meter because of his union activities is unsupported by the record.

The Board adopted the findings and conclusions of the trial examiner and found the Company discharged Van Meter because of his union activities in violation of Section 8(a) (3) and (1) of the Act. The order directs the Company to offer Van Meter immediate and full reinstatement to his job with back pay from the date of discharge to the offer of reinstatement.

Up until the last month of his employment, Van Meter was not an active participant in union activities. However, during that last month, he began to engage openly in union activities. He wore a union button. He distributed such buttons to fellow employees and urged them to wear them. His activities centered around the second election held December 29, 1966. Although in fact, the union lost that election by a narrow margin, the outcome was not known for months thereafter. It may well be inferred that feelings engendered by the then recent and unresolved election were running high. Van Meter testified that on the date of his discharge when he asked several of his co-employees to wear their union buttons, they appeared "scared."

The Board could properly consider that neither foreman Meador nor any other representative of the Company had expressed to him any feeling or objection with reference to his announced plan to quit if his raise was denied. It could also consider that only a few minutes after the episode of Van Meter's talks with his fellow employees, resulting in their once more wearing their union buttons, that foreman Meador was telling Van Meter "tonight is when you quit," and, in effect, ushering Van Meter out of the plant without permitting him to finish the shift, sign his time card or inform the woman with whom he rode to work, of his departure.

Foreman Meador did not testify. The testimony of Van Meter as to what was said and done is undisputed. No explanation was made as to why Meador was not called as a witness. In Neidhoefer v. Automobile Ins. Co. of Hartford, Conn., 7 Cir., 182 F.2d 269, 271, we pointed out that failure to produce evidence, which under the circumstances would be expected, gives rise to a presumption against the party failing to produce it.

It seems clear from the record than Van Meter had not reached a final conclusion as to quitting his job. Apparently he was willing to continue work for some indefinite period. The Board was justified in its finding that it was the Company which was solely responsible for the termination of Van Meter's employment.

The Company's argument that it should be required only to tender two weeks' back pay is, of course, based on its claim that Van Meter quit and was not discharged. Furthermore, it is well settled that when it is determined the employer discriminatorily discharges an employee, it has the burden of proof of showing the employee would have been discharged later for purely economic reasons.

True it is, the Company did show that in the four months immediately following Van Meter's discharge, some two hundred employees were laid off, ninety-four in February and March and another one hundred and eleven in May. Nevertheless, the Board could consider that Van Meter had the highest seniority in his classification. Also, that less than one hour before his discharge, he had been told by foreman Meador that he could remain for the remainder of the shift although the other employees were being sent home for lack of materials to keep them busy.

The Company urges that the order proposed by the Board is too broad in its scope. The Board ordered the petitioner to cease and desist from discouraging membership not only in the union but also in "any other labor organization" by discriminatorily discharging any of its employees or discriminating in any other manner in respect to their hire or tenure of employment, or any term or condition of employment, In N.L.R.B. v. Express Pub. Co., 312 U.S. 426, 437, 61 S.Ct. 693, 700, 85 L.Ed. 930 (1941), it was stated: "To justify an order restraining other violations it must appear that they bear some resemblance to that which the employer has committed or that danger of their commission in the future is to be anticipated from the course of his conduct in the past."

Including other labor organizations in these circumstances is proper. Marshfield Steel Company v. N.L.R.B., 8 Cir., 324 F.2d 333, 339 (1963). We think also that where the employer has been found to have discharged an employee because of union activity that discriminations as to hire and fire and terms and conditions of employment bear a close resemblance to the found violation. Alleghany Pepsi-Cola Bottling Company v. N.L.R.B., 3 Cir., 312 F.2d 529, 532 (1963); N.L.R.B. v. Mayrath Company, 7 Cir., 319 F.2d 424, 428 (1963).

In P. R. Mallory & Co., Inc. v. N.L.R.B., 7 Cir., 389 F.2d 704, 707 (1967), this Court considered an earlier phase of this controversy. The Company had written a series of letters to its employees urging that the union be rejected, stating reasons therefor. The Labor Board held that the writing of such letters was an unfair labor practice. We disagreed, holding that the Company was protected in writing such letters under Section 8(c) of the Act.

Certainly such letters were intended to discourage membership in the union. In approving the order now before us, we do not intend in any way, to recede or back away from our holding in the *Mallory* case mentioned. Furthermore, the order before us provides that the prohibition of discouraging union membership is limited to "by discriminatorily discharging any of its employees or discriminating in any other manner in respect to their hire or tenure of employment or any term or condition of employment."

We hold that the record sustains the finding of the Board that the Company violated Section 8(a) (3) and (1) of the Act by discharging Van Meter because of his union activities.

Furthermore, that the Board properly ordered the Company to reinstate Van Meter with full back pay.

We hold further that the order of the Board is not too broad in view of the limitations hereinbefore stated as to the decision of this Court in P. R. Mallory & Co., Inc. v. N.L.R.B., supra.

The order of the Board (169 N.L.R.B. No. 5) will be

Enforced.