**NATIONAL LABOR RELATIONS
BOARD, Petitioner,**

v.

**AUTOMOTIVE CONTROLS CORPORA-
TION, Respondent.**

No. 9930.

United States Court of Appeals
Tenth Circuit.

Jan. 21, 1969.

Jerome N. Weinstein, Atty., N. L. R. B. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel and Gary Green, Atty., N. L. R. B., on the brief), Washington, D. C., for petitioner.

George K. McPherson, Jr., Atlanta, Ga. (Robert L. Beard, James A. Smith of Smith, Currie & Hancock, Atlanta, Ga., on the brief), for respondent.

Before MURRAH, Chief Judge, and HILL and SETH, Circuit Judges.

HILL, Circuit Judge.

The National Labor Relations Board petitions this court, pursuant to section 10(e) of the National Labor Relations Act as amended, 29 U.S.C. § 151 et seq., for enforcement of its order[1] finding that Automotive Controls Corporation violated sections 8(a) (1), (3) and (4) of the Act. The Board found that the company violated section 8(a) (1) by coercively interrogating employees, by creating an impression of surveillance over their union activities, and by threatening the employees with reprisals, i. e., movement of the plant, should the union[2] win a forthcoming representation election. The Board further concluded that the employer violated sections 8(a) (4), (3) and (1) by discharging an employee, Nedra Rose, and violated sections 8(a) (3) and (1) by refusing to raise the wages of employee Raymond Ross. The respondent, Automotive Controls Corporation, while disagreeing in principle with all of the Board's determinations, asserts that enforcement should be denied only insofar as it relates to the findings that company speeches threatened the employees and that Nedra Rose was discriminatorily discharged.

Automotive Controls Corporation operates a plant in Independence, Kansas, that manufactures automobile voltage regulators. During January, 1966, the union began an organizational campaign directed to the Company's production and maintenance workers. On January 20, 1966, the union filed a petition with the Board for a representation election which was held on March 25, 1966. Having been defeated by a vote of 80 to 206, the union filed objections to employer conduct affecting the election and also filed the charges giving rise to the alleged unfair labor practices at issue here.[3]

The first finding of the Board that is challenged by the respondent involves the Board's determination that a pre-election speech given to the employees by Frederick Mancheski, president of the company, contained a "not very heavily veiled threat that the respondent would move its plant if the union were to be successful in its campaign." The trial examiner concluded, and the Board agreed, that the speech, standing alone, fell within the ambit of employer free speech protected by section 8(c) of the Act.[4] However, it was felt that when

---

1. 165 NLRB No. 43 (1967).

2. Local 128, International Union of Operating Engineers, AFL–CIO.

3. The unfair labor practice charges and the election objections were consolidated for purposes of the trial examiner's hearing. The election was set aside partly because of the unfair labor practices found, and partly because of a coercive newspaper advertisement making "an impartial election impossible."

4. Section 8(c) provides that: "The expressing of any views, argument, or opinion * * * shall not constitute or be evidence of an unfair labor practice * * * if such expression contains no

the speech was taken together with a previous speech delivered on behalf of the employer by one John Echlin and a letter issued its employees by the company, then the speech was thrust "over the narrow line from protected free speech into the area of proscribed conduct." When considered in conjunction with the other communications of the company, the Board determined that the speech became a syllogistic threat indicating that a plant that loses money must move, unionization will cause the plant to lose money, ergo if the plant is unionized it will move.

We begin with the premise that employers' statements that are not coercive are protected by section 8(c) and cannot be the basis for finding a violation of section 8(a) (1).[5] Although on occasion the coerciveness of a statement is patently obvious, generally the test of coerciveness is one of total impact to be determined in light of the background in which the statement is made.[6] Hence, a speech that is deemed threatening in one situation may be wholly protected in another. The issue then is one of determining whether there is substantial evidence to support the Board's finding that this particular speech, when viewed in light of the totality of employer communications, was such as to convey a threat of reprisal in the event the union campaign proved successful.

During the course of election campaigning, the question arose as to whether the company could move its plant in retaliation for the union's winning the election. The union issued several circulars emphatically stating that federal law precluded such a move. Consequent-

ly, at the conclusion of the speech[7] given to the employees on March 21, the speaker, John Echlin, a chief figure in the employer's parent corporation, Echlin Manufacturing Company, was asked whether the rumor was true "that if the plant went union that they would move." Echlin replied: "Not as long as it continues to operate on a profit margin." Some two days later the company sent a letter to the employees in which it was stated that the most important issue in the campaign was whether the employer could afford the added costs and turmoil the union could cause and still continue its operations. The letter indicated that the plant had incurred losses totalling $500,000 and that there would be a point at which management could conclude that the plant was too unprofitable to continue. On that same day, two days before the election, Mancheski began to deliver his prepared speech to groups of assembled workers. After first indicating that the plant was still in its infancy and that the increased costs likely to be the result of unionization could fatally damage the business, Mancheski declared that the union had lied to the employees: "They say that Automotive Controls cannot move if you have a union. We can move any plant at any time it proves to be an undesirable plant location, whether there is a union present or not."

In determining whether these remarks transcend the bounds of free speech enumerated in section 8(c), it is firmly established that in the event that the speech, when viewed in context, does not contain threats, but instead contains predictions and prophecy, then it is protected and cannot be evidence of a section

threat of reprisal or force or promise of benefit."

5. NLRB v. Beatrice Foods Co., 183 F.2d 726 (10th Cir. 1950); see generally, Annot. 35 A.L.R.2d 417 (1954).

6. Serv-Air, Inc. v. NLRB, 395 F.2d 557, 561 (10th Cir. 1968); J. P. Stevens & Co. v. NLRB, 380 F.2d 292 (2d Cir. 1967); P. R. Mallory & Co. v. NLRB, 389 F.2d 704 (7th Cir. 1967).

7. After sketching a brief history of the company, the speech indicated that the financing for the plant originated "from banks back East" which took a dim view of the fact that the plant was not making a profit. It was pointed out that the union's insistence upon increasing wages would be in direct conflict with the employees' job security.

8(a) (1) violation.[8]  Consequently, an employer is free to express the opinion that dire economic consequences will befall his employees if they choose a union to represent them, so long as the prediction does not amount to a threat that the adverse consequences will be deliberately inflicted by the employer in return for unionization.[9]  Therefore, "a prediction that competitive conditions will force a plant to close if a union contract is signed is protected, whereas a threat to close down in retaliation to unionization is beyond the pale."[10]  A fair reading of the communications at issue here undeniably leads to the conclusion that the statements were merely predictions of dire economic consequences well within the protection of section 8(c) of the Act. Even if the Board was correct in concluding that the remarks expressed the syllogism that unionization might increase losses by increasing costs which in turn could lead to the plant's being closed, this prophecy falls far short of suggesting that if the union were successful the company would of its own volition move the plant.  To conclude otherwise would be to ignore the plain meaning of the employers' remarks.  It is to be remembered that an employer is a rightful contestant for the loyalty of his employees.  In order to insure that election debate is "uninhibited, robust, and wide-open"[11] it is necessary to guard against the Board adopting an overly restrictive attitude toward employer communications.  We therefore conclude that the determination that the company's statements violated section 8(a) (1) is not supported by substantial evidence.

We turn now to consideration of whether employee Rose was discharged because of her participation in union activities, or whether, as asserted by the respondent, she was discharged for cause. Unless it can be said that the conclusion that union discrimination was as least a partial motive for the dismissal was clearly erroneous, the decision of the trial examiner and the Board to that effect must be sustained.

The evidence indicates that Rose was employed on December 7, 1965, to work mainly in the employer's subassembly department.  In keeping with company policy, she was a probationary employee[12] during the first three months on the job and was moved frequently from one kind of machine operation to another.  Most of the machines Rose operated had an established minimum production level, designated as a "standard," which employees were expected to maintain while operating the machines. Employees producing in excess of "100 percent standard" received additional incentive pay.

8. J. S. Dillon & Sons Stores Co. v. NLRB, 338 F.2d 395 (10th Cir. 1964); NLRB v. M & B Headware Co., 349 F.2d 170 (4th Cir. 1965); P. R. Mallory & Co. v. NLRB, 389 F.2d 704 (7th Cir. 1967); NLRB v. TRW–Semiconductors, Inc., 385 F.2d 753 (9th Cir. 1967).

9. NLRB v. Golub Corp., 388 F.2d 921 (2d Cir. 1967) and citations therein at 929; NLRB v. Transport Clearings, Inc., 311 F.2d 519 (5th Cir. 1962); P. R. Mallory & Co. v. NLRB, 389 F.2d 704, 707 (7th Cir. 1967); NLRB v. TRW–Semiconductors, Inc., 385 F.2d 753 (9th Cir. 1967).

10. NLRB v. Brownwood Mfg. Co., 363 F.2d 136, 138 (5th Cir. 1966) and Texas Industries, Inc. v. NLRB, 336 F.2d 128, 130 (5th Cir. 1964); both citing NLRB v. Morris Fishman & Sons, Inc., 278 F.2d 792 (3d Cir. 1960).

11. Linn v. United Plant Guard Workers, 383 U.S. 53, 62, 86 S.Ct. 657, 15 L.Ed. 2d 582 (1966).  "If § 8(c) does not permit an employer to counter promises of pie in the sky with reasonable warnings that the pie may be a mirage, it would indeed keep Congress' word of promise to the ear but break it to the hope."  NLRB v. River Togs, Inc., 382 F.2d 198, 202 (2d Cir. 1967).

12. All employees worked as probationary employees during the first three months of employment.  As such, they were on trial to prove that they were capable of performing the work well enough to become permanent employees.  Probationary employees did not enjoy fringe benefits nor did they have the rights of permanent employees respecting such matters as layoffs and seniority.

From the very beginning of the union organization campaign Rose was an active union supporter attending union meetings and asking questions of the speakers. One of the questions she asked concerning whether employees could be dismissed for talking about the union during working hours was posted on company premises together with the company's response thereto. Rose later approached James Thornton, the plant manager, telling him that the question was her's and that she disapproved of the company's answer. She also indicated her unwavering support for the union.

On February 8, at a representation hearing held to determine who would be eligible to vote in the forthcoming election, Rose gave testimony favorable to the union. The next day, the group leader of the subassembly department informed Arthur Tull, the department foreman, that Rose and another employee, Betty Wade, had engaged in an unauthorized job change. Tull admonished the two employees who denied having exchanged jobs. Tull then requested Rose to accompany him to another area of the plant where the two discussed her work record. Tull informed Rose that she was talking too much and spending too much time away from her work station. He also explained that according to his daily record of employee efficiency, she was not meeting "standard." Tull had not, however, computed her rating for the two weeks prior to the discussion. Because Rose had been working with a severely injured finger which had recently healed, she asked Tull to compute her efficiency rating for the preceding two weeks. When he did so, it was found that her overall percentage for the two week period exceeded 100 percent.

From the time of that discussion with Tull, the first of that nature she had with management since beginning work, until the date of her discharge on March

3, 1966, Rose made herself highly visible as a union supporter. At the conclusion of the various speeches given on behalf of management during that time, Rose asked many questions that would indicate to the company that she favored the union. At one particular question and answer session after Rose had asked a number of questions, Mancheski told her to give someone else an opportunity to be heard. When none of the other employees came forth, Rose again sought recognition, Mancheski replied: "Well, we are back to you again!" On March 3, three days before the end of her probationary period, Tull informed Rose that she was being discharged. When pressed for an explanation, he indicated that she was being discharged because she had engaged in an unauthorized job change. When Rose again denied that she had done so, Tull replied that it was irrelevant anyway. He explained that she talked too much, was away from her work station too often, and failed to perform up to "standard."

The trial examiner and the Board found the company's reasons for the discharge to be unpersuasive. The Board noted that Rose, well known to the company as a union leader, was approached by the company for the first time the day after having given testimony at the representation hearing. It was felt that this timing, together with the company's demonstrated antiunion animus, and the weakness of the alleged business reasons for the discharge, combined to compel the conclusion that Rose was discharged in violation of sections 8(a) (4), (3) and (1) of the Act.

As we indicated in Cain's Coffee Company v. NLRB, 404 F.2d 1172 (10th Cir. 1968), the discharge of employees who are actively engaged in union affairs may give rise to an inference of violative discrimination.[13] The issue,

13. The rationale underlying this and many similar inferences entertained in this area of the law was aptly summarized by Chief Judge Murrah when he stated: "Rarely, if ever, does an employer admit that an employee has been discharged for participation in union activities. Discriminaton must, therefore, usually be

however, must be determined by the degree of significance to be given to the employer's explanation for the dismissal. Here the employer asserts that the discharge was motivated by the employee's excessive talking, frequency away from the work area, and inadequate work record.[14] All the supposed reasons relate essentially to performance. Consequently, the employer sought to demonstrate that because Rose failed to perform up to "standard," she necessarily was incompetent and was thus properly dismissed. It was demonstrated that Rose's efficiency percentages, averaged for two week intervals during the period she was employed, were 76.7, 68, 69, 92, 96, 65 and 65 percent. However, when forced on cross-examination to reveal comparable percentages for permanent employees the only figures supplied by the company indicated that one permanent employee had percentages of 66, 56, 45.3, 52.5, 69, 63 and 59, while the percentages for yet another permanent employee were 71, 60.1, 68, 69, 79 and 87. When asked why these employees had not been discharged, the employer replied that the standards were being revised from time to time and were not taken as definitive indications of employee ability. Thus, the employer admitted that the standards were not particularly meaningful, yet failed to introduce any other evidence to show comparisons between Rose's efficiency and that of other employees. Similarly, as to the claim that Rose talked too much and left the work area too often, the employer merely offered the uncorroborated opinion of company supervisors to that effect. Again, this falls far short of demonstrating that Rose's conduct was excessive when compared with that of other employees similarly situated. In sum, the company failed to come forward with evidence that would convincingly establish a legitimate motive for the discharge.

This court cannot "displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo."[15] Admittedly, the evidence relied upon by the Board to establish discrimination, namely, the company's anti-union animus as demonstrated by the coercive interrogations and other 8(a)(1) violations, and the timing of the discharge, is less than overwhelming. Nevertheless, the weakness of the evidence presented by the company to establish legitimate business reasons for the dismissal is such that we cannot say with a definite and firm conviction that the Board's conclusion was clearly erroneous. It follows that the unpersuasiveness of the employer's reasons for the discharge, the fact that the employee's transgressions first became of interest after she testified at the representation hearing, the employee's active union participation, and the company's manifest union hostility, all combine to provide adequate support for the decision of the Board.

Enforcement of the order of the Board insofar as it relates to the finding that Mancheski's speech violated section 8(a)(1) of the Act will be denied; in all other respects the order of the Board will be enforced.

proved by circumstantial evidence, and properly so." Betts Baking Co. v. NLRB, 380 F.2d 199, 204 (10th Cir. 1967).

14. The "unauthorized job change" was dismissed by foreman Tull as being immaterial. Indeed, from the record it is not clear as to whether such change occurred, but in any event, because the employer apparently regarded the incident as insignificant, this court will do likewise.

15. NLRB v. Walton Mfg. Co., 369 U.S. 404, 405, 82 S.Ct. 853, 854, 7 L.Ed.2d 829 (1962) quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951); NLRB v. Browning, 268 F.2d 938, 940 (10th Cir. 1959).