## NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

## LAARS ENGINEERS, INC., Respondent.

### No. 18994.

United States Court of Appeals
Ninth Circuit.
June 8, 1964.

Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Melvin Pollack, Atty., N. L. R. B., Washington, D. C., for petitioner.

Hill, Farrer & Burrill, Ray L. Johnson, Jr., Stanley E. Tobin, Los Angeles, Cal., for respondent.

Before JERTBERG, BROWNING and DUNIWAY, Circuit Judges.

JERTBERG, Circuit Judge.

The case is before us on the petition of the National Labor Relations Board (hereinafter the Board), for enforcement of its order issued on June 20, 1963, against Laars Engineers, Inc., (hereinafter referred to as respondent). The Board's decision and order are recorded at 142 NLRB No. 146. This court has jurisdiction of the proceedings under Section 10(a) of the Act. No jurisdictional issue is presented on this appeal.

The Board found that respondent violated Section 8(a) (1) of the Act,[1] by accelerating a wage increase to its employees in an effort to influence them not to support the organizational effort of the International Association of Machinists, AFL-CIO, (hereinafter called the

---

1. "SEC. 7. Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 8(a) (3)."

"SEC. 8(a). It shall be an unfair labor practice for an employer—

"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7;"

Union) and by sending a letter to each of its employees which the Board found constituted a promise of economic benefits for the purpose of inducing its employees to vote against the Union in a Board election.

In its order the Board adopted the findings, conclusions and recommendations of the Trial Examiner.[2]

The respondent employs approximately sixty-five persons at its North Hollywood, California, boiler manufacturing plant, whose work is under the general supervision of its president, Avy L. Miller.

The employees of respondent had never been represented by a Union and no collective bargaining agreement was existent between any union and the respondent. For the past several years, it has dealt with a group of its employees called the "Employees' Committee" which acts as representative of the employees and consists of one employee from each of the respondent's three production departments. It has been the practice of the respondent to review the wage structure of its employees each year and to match or better wage increases occurring among respondent's competitors. The last increase in wages to all production employees was granted in April, 1961. Miller testified that the wage increases were made on the basis of a survey of wages paid by competitors, which survey usually required a month or two to conduct.

In May of 1962, the respondent's employees, through their Employees' Committee, requested a wage increase but respondent determined that the cost of living factor, which was the basis for the employees' request, had not altered sufficiently to justify an increase at that time. On July 24, 1962, at a meeting attended by Miller, the Employees' Committee and Tom Clark, general manager of respondent's plant, members of the Committee requested an increase

based upon newspaper reports of wage increases at other plants. Miller stated that there had been such reports, promised to conduct a survey, and if the reports were confirmed to make a wage adjustment by matching or bettering wage increases granted by competitors. At that meeting Miller stated that Tom Clark would conduct a survey.

On July 30, 1962, toward the end of the work shift, two representatives of the Union stationed themselves, one at each of the entrances to the parking lot of the respondent's plant, and gave to each of respondent's employees a kit as each left the parking lot on foot or by car. The kit consisted of a folder colored red, white and blue containing information about employees' rights under the National Labor Relations Act, material describing the advantages of unionization claimed by the Union, and requested each employee to execute and mail to the Union a form enclosed in the kit which would have the effect, upon execution, of designating the Union as the signatory's bargaining representative. The parking lot was located across an alley from respondent's plant, one of the entrances was about seventy-five feet from the plant; the other entrance was near the plant. The plant entrance facing the parking lot was open at the time the distribution of the kits was made.

On August 8, 1962, Miller met with the Employees' Committee and told the members of the Committee that all production and maintenance employees would be given a five percent increase in their wages, effective immediately, and that when Mr. Clark completed his survey, the increase would be adjusted upward, if necessary, to reflect the general round of wage increases, but that in no case would the interim increase be adjusted downward.

On August 20, 1962, the Union filed a representative petition with the Board, seeking election as bargaining repre-

---

2. One member of the Board found nothing in the preelection letter sent to respondent's employees violative of Section 8(a) (1) of the Act, but did find the letter is within the constitutional right of "free speech" and protected by Section 8(c) of the Act.

sentative of respondent's production and maintenance employees. Thereafter, in the representative proceedings, the Union and respondent entered into a "consent election agreement", and an election was scheduled for September 20, 1962. Two days before the scheduled election date respondent sent a special delivery letter to each employee eligible to vote. The letter sets forth comparative wage and benefit tables between respondent and two of its competitors whose employees were represented by Unions, which showed that respondent pays higher wages and provides greater benefits than two unionized competitors, one of whom bargains collectively with the Union. The letter inter alia recites that respondent was opposed to an outside Union; that it had always been respondent's policy to keep wages higher than the average in the industry; that respondent's average employee was ahead almost $600.00 a year without ever having paid anything to a Union; respondent could not pay any more wages or benefits at that time because to do so would put it at a competitive disadvantage with competitors paying less; and that respondent would never agree to wage demands that would make it noncompetitive and force it out of business, and that it would continue to operate the plant in event of a strike. The letter concludes as follows:

"Is it worth letting yourself be talked into the possible loss of your job and the sure loss of a pleasant place to work when you are already getting much more than this same union has gotten for its members in this industry, and you are already getting all the wages and benefits we can possibly pay?

Just look at the record and you will see that a 'yes' vote is a vote for a union which has obtained . . .
> lower wages
> fewer benefits
> more union dues
> more union assessments
> possible strikes

A 'NO' vote is a vote for . . .
> higher wages
> more benefits
> no dues
> no assessments
> no strikes

Only *you* can decide."

The election, which the Union lost 34 to 10, was set aside by the Board's Regional Director, upon objections filed by the Union, on September 26, 1962.

The Board found that respondent put the wage increase into effect when it did in order "to deflect the interest of its employees from the Union's organizational efforts", and concluded that by granting the increase that respondent "interfered with the exercise of rights guaranteed its employees by Section 7 of the Act, thereby violating 8(a) (1) of the Act."

Respondent granted a wage increase on August 8, 1962, and concedes that as a general proposition such activity, when done for the purpose of inducing employees to vote against the Union, is violative of Section 8(a) (1). It is respondent's position that the evidence is insufficient to support the conclusion that the wage increase was granted for the purpose of thwarting the organizational rights of the employees. In this connection respondent asserts:

(1) That the record is barren of any evidence that respondent knew at the time it announced its wage increase on August 8, 1962, that the Union was organizing its employees;

(2) That the Board ignored that a wage increase was promised to the employees prior to any Union activity of any kind; and

(3) That the Board's conclusion the wage increase was granted for the purpose of thwarting the organizational rights of the employees is based only on inference and surmise.

In respect to respondent's first assertion, we note that although Miller testified he had not seen the distribution of the kits at the parking lot on July 30, 1962, he testified that such activity had

come to his attention. In response to the Trial Examiner's question to pin down approximately when he learned of the organizational activity, Miller testified at one point that it was about ten days to two weeks after July 30th; at another point that it was about the time of the August 8th meeting; and at another time that it may have been before or after the August 8th meeting, but his recollection failed as to just when.

In respect to respondent's second assertion, it is true that the Employees' Committee requested a wage increase prior to the organizational activities of the Union and that respondent promised to conduct a survey of reports of wage increases at other plants, and, if the reports were confirmed, to make a wage adjustment by matching or bettering wage increases of other competitors. The question before us, however, is not whether respondent would have increased wages at some time or other in response to the request of the Employees' Committee, but whether the increase was granted when it was, because of the Union activities. We note from the record that the increase was granted prior to the completion of the survey, and that the increase granted was an interim one —clear departures from past practices of respondent. No reason appears why the interim increase was granted when it was, and before completion of the survey, except Miller's testimony that a wage adjustment was overdue since some sixteen months had elapsed since the last increase.

In respect to respondent's third assertion, it is to be borne in mind that the intent, purpose or motive of respondent in granting the wage increase must necessarily rest upon reasonable inferences drawn from the evidence in the case and the weight to be accorded to the testimony of Miller, who was the only witness before the Trial Examiner on this phase of the case. Clearly, Miller was an interested witness who was opposed to the unionization of respondent's employees. It is seldom that motive, intent or purpose of a person in performing an act may be established by direct evidence. Also to be considered is the close coincidence of the Union activity and the wage increase.

We have reviewed the entire record and hold that the evidence supporting the finding and conclusion of the Board that the wage increase was granted for the purpose of thwarting the organizational rights of the employees is substantial when viewed in the light that the record in its entirety furnishes.

We disagree with the Board that certain statements from the respondent's preelection letter constituted interference, restraint, or coercion within the meaning of Section 8(a) (1) of the Act. We agree with the view expressed by Member Rogers of the Board that "the letter, in pointing out to the employees their present benefits as compared with the benefits obtained by the Union in plants it represented, is within the constitutional right of 'free speech' and is protected by Section 8(c) of the Act."[3] We see no threat of reprisal, or force, or promise of benefit in the letter. The letter as a whole does not justify the narrow and strained construction given to it by the Board. See Union Carbide Corporation v. National Labor Relations Board, 310 F.2d 844 (6th Cir.1962).

Such finding and conclusion of the Board is vacated and set aside. In view of the last stated holding, we believe that the decision and order of the Board is too broad and that paragraph (b) of the "Cease and Desist From" portion thereof should be and is hereby stricken therefrom, and that there be deleted from the notice to be posted the corresponding provision therein contained. In National Labor Relations Board v.

---

3. "SEC. 8. (c) The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this Act, if such expression contains no threat of reprisal or force or promise of benefit. * * *"

**668**

International Longshoremen's and Warehousemen's Union, Local 10, et al., 9 Cir., 283 F.2d 558 (1960), this court stated at page 568:

"The Board cannot restrain practices which it has neither found to have been pursued nor to be related to proven unlawful conduct. * * * *"

The Board's petition for enforcement, as herein modified, is granted.