NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

SONORA SUNDRY SALES, INC., d/b/a
Value Giant, Respondent.

No. 21909.

United States Court of Appeals
Ninth Circuit.

Aug. 2, 1968.

Warren Davidson (argued), Roy O. Hoffman, Director, N.L.R.B., San Francisco, Cal., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Washington, D. C., for appellant.

Arthur Mendelson (argued), of Littler, Mendelson & Fastiff, San Francisco, Cal., Davis & Cowell, Oakland, Cal., for appellee.

Before MERRILL and DUNIWAY, Circuit Judges, and TAYLOR, District Judge.

MERRILL, Circuit Judge:

This case is before the court upon petition of the National Labor Relations Board to enforce its order issued against respondent on November 1, 1966, as reported at 161 N.L.R.B. No. 53. The Board found that respondent had violated § 8(a) (1) of the Act, 29 U.S.C. § 158(a) (1), by threatening its employees that execution of a union contract would result in decreased wage rate. The Board also found that respondent had refused to recognize and bargain with the union which represented a majority of the employees in violation of § 8(a) (5) of the Act, 29 U.S.C. § 158(a) (5).[1] The Board adopted the findings of the trial examiner as set forth in the margin.[2] From

---

1. "158. Unfair labor practices
   (a) It shall be an unfair labor practice for an employer—
   (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;
   *   *   *   *   *
   (5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title."

2. "A. Sequence of events
   On May 27, 1965, Respondent opened its store in Sonora, California to the public. Most of its employees were hired between April 20 and May 27, 1965. Between the period of June 3 and June 8, 1965, the Union obtained signatures on membership applications from 11 of Respondent's employees involved, and on June 9, 1965, the Union requested recognition as the bargaining representative for all selling and non-selling employees at Respondent's Sonora, California store, excluding guards, watchmen and supervisors, as defined in the Act. * * *

   On June 5, Store Manager W. H. Finch first learned of the Union's organization of his employees. * * * Finch then

called by telephone Paul Kase, president of Respondent, and informed him that the Union was organizing the employees. Kase told Finch that he would send him copies of a memorandum and ballots for distribution to the employees on this matter.

On June 7, Finch assembled and spoke to the employees. The Sonora store having recently opened and the permanent working force having been selected, a primary purpose of this meeting was orientation of employees. Finch discussed with them such matters as their dress, their relations with the customers, the area of their responsibility and Respondent's employee benefits. He read to them, from Respondent's operation manual, provisions on such matters as vacations, sick leave, holidays, et cetera; and on this occasion or shortly thereafter, he distributed to employees excerpts from Respondent's manual.

During the meeting, an employee asked Finch about a drug industry agreement that a union representative had shown them. Finch stated that this agreement, as such, did not pertain to the Sonora store and could not be signed by the employer as the store did not have a prescription pharmacy; that the only agreement that this store would fall under would be a variety store contract and the starting wage in it was less than the employees were currently receiving.

1. Balloting of employees, June 9, 1965

On June 9, 1965, Finch received from Kase copies of a memorandum and ballots for distribution to the employees. A copy of each was distributed to the employees working that day, and they were told that the Company would like for them to mark the ballots and place them on Finch's desk, but if they did not wish to do this, they did not have to. The memorandum is quoted as follows:

MEMORANDUM

From: Paul D. Kase          June 8, 1965
To: TO ALL EMPLOYEES

Attached you will find a questionnaire which we would like to have you fill out so that we may have your opinion concerning this matter. Please place an 'x' in the box that indicates your desires concerning this matter.

It is our understanding that the local union representative has been handing out to you a contract which covers the Drug Industry. We sincerely hope that you are not being mislead after reading this contract. The contract which you have been handed by the Union representative and the wage rates contained within it, do not apply to our type of Retail Operation. This contract covers the Drug Industry which includes a Prescription Pharmacy. We do not now or intend in the future to have a Prescription Pharmacy on the premises. We would also like to point out that neither union nor any of its representatives have ever contacted us and shown us the contract which you have been handed. If they had, possibly some of the confusion that now exists would have been cleared up.

We wish to express our thanks for helping us to have a very successful opening in Sonora and would appreciate the return of the questionnaire to Mr. Finch as soon as possible. The ballot distributed to employees is quoted as follows:

SONORA SUNDRY SALES
ROUTE #2, BOX 700
SONORA, CALIF.

TO ALL EMPLOYEES

We may expect that in the near future the Retail Clerks Union Local, may ask us to recognize the union as your Collective Bargaining Agent solely on the basis of a check of signed Union Application Cards without the opportunity of your having a secret ballot election. Asking for recognition on the basis of a card check is beginning to become a common practice of many labor unions in our business. We, on the other hand, doubt very much that you would want us to recognize the union unless you voted for the union in a secret ballot election. We suspect that often times you may sign a Union Application Card just to get rid of the union organizer who may be a nuisance to you, and therefore do doubt whether Union Application Cards reflect your true wishes in the same way that a secret ballot election would.

We would like to know your thinking on this subject. In order to clarify your views, we request that you check the following statement which expresses your opinion.

I want to show by desires regarding union representation by secret ballot election.                    . . . . . . . . . .

I want the company to recognize the union on the basis of a card check without a secret ballot election.                    . . . . . . . . . .

This is not a survey to determine whether or not you want the union. Obviously we cannot and would not want to recognize the union if it did not in fact represent the majority of our employees. This is only a survey to

help us determine whether the union's majority or lack of majority should be decided on a card check or by a secret ballot election.

Please do not sign this survey form. We do not wish to know how any particular person feels. However, we hope you will help us resolve our doubts by expressing your view, and be assured that you need have no reservations in what you say. There will be no recriminations whatsoever no matter what your views may be. We are just trying to determine your thinking on whether in this store application cards are a valid way to test the union's majority status or whether you would prefer to have a secret ballot election.

### VALUE GIANT STORES

On June 10, memorandums and ballots were given to employees who had not worked on June 9 and they were given the same instructions.

Twelve ballots were returned to Finch's desk. Eleven were marked with an 'x' in the square, for a 'secret ballot election.' One employee returned her ballot unmarked to Finch. * * * He kept these ballots in his desk until Saturday, June 12, when he turned them over to Retail Supervisor Russell Robinson. * * *

2. Union's request for recognition and proof of majority, June 9, 1965

On the afternoon of June 9, 1965 and before all of the ballots had been returned to Finch, he was visited by Union representatives Jerry Turner and Ray Mierly. Turner informed him that the Union had been organizing the employees and was requesting recognition as bargaining agent. He handed Finch two documents: (1) a letter advising that the Union had been selected by a majority of selling and non-selling employees at the Sonora store, offering written proof of this fact, and demanding recognition; (2) a document entitled 'Recognition Agreement,' providing that:

Having examined proof of Retail Clerks Union, Local 588's majority status, Sonora Sundries Sales, DBA Value Giant recognizes said Union as collective bargaining agent of its employees employed at East Highway 108, Sonora, California, and agrees to bargain collectively with said Union for terms and conditions of employment of said employees.

Finch asked Turner on what basis did he claim to represent a majority of the employees. Turner handed him the 11 authorization cards. Finch looked through the cards and replied that it appeared the Union had them all signed up—although he noticed cards from three employees who were currently not in Respondent's employ. Finch questioned whether he could or should sign the document handed him by Turner. Then he attempted to get in contact with Paul Kase or one of the other officials of Respondent on this matter. He was unable to contact any person in authority and he spoke with the secretary to Paul Kase. He suggested that she try to contact an attorney.

After this telephone call, Finch reread the documents handed him by Turner. Turner stated that the purpose of the recognition agreement was to acknowledge the fact that the Union had a majority of the employees signed up. Finch replied that since it appeared to be true, he could see no harm in signing the document. Turner then signed the agreement form and Finch also signed it. Mierly left with these two forms in his possession. Turner continued to talk with Finch, and shortly after Mierly left the telephone rang. The call was from Albert Kesseler, attorney for Respondent. He inquired as to the problem, and Finch informed him of the visit from the union representatives and read to the attorney the two papers handed him by Turner. The attorney told him that he should not sign any documents and that he should send all the papers to the Company's headquarters in San Francisco. He then spoke to Turner.

Attorney Kesseler told Turner that Finch was not to sign anything and that the matter would be taken up by the officials of the Company. They then discussed a place for their meeting either in Sacramento or in San Francisco. At the conclusion of this conversation, Turner told Finch that there appeared to be no problem. He then suggested to Finch that he sign a third document which acknowledged that the Union had shown him the authorization cards of a majority of the employees. Finch signed this document. * * *

3. Speech of Russell Robinson, June 12, 1965

On Saturday, June 12, 1965, Russell Robinson, retail supervisor for Ames Mercantile Company, spoke to the employees of Respondent at 8:00 a.m. They had been told the day before by Store Manager Finch to report to the store an hour early for this meeting. Robinson was introduced by Finch, who told the employees that Robinson was there to acquaint them with the union situation from the Company's point of view, and

that he was in no way advising them whether or not they should join the Union. Robinson stated that he understood they had all signed union cards, and that it was entirely up to the employees if they wanted a union or not; that he could not tell them to join the Union or not, and that there would be no reprisals of any kind if they did, but that he did feel they had been shown the wrong contract by the union representative; that he did not think Ames Company would sign a 'drug contract' because Respondent did not have a prescription counter and never would have one; that the other Ames stores that did have a union were under a discount or variety store contract. He stated that the beginning wage, under the discount store agreement, was $1.35 per hour whereas they were currently receiving $1.40 an hour. One employee asked whether they could get their cards back from the Union, and he replied that they could contact the Union and ask for the cards if they wanted to, but any action they took would be completely on their own. He told them that whether they realized it or not, they had given the Union the right to picket the store by signing the cards. An employee asked about the $1.50 wage rate he thought they were to get when the store opened, and Robinson said that that was a misunderstanding, and that he wanted to get the matter straight as to the wage policy; that the employees of Value Giant Stores start at $1.40 per hour, get a pay increase to $1.50 after a period of 65 days and an increase to $1.70 after one year; that if they joined the Union in the meantime, then, under the discount store contract, it would take them longer to build up to the top pay than it would under Respondent's pay increase program. He also informed them of the Company's program or policy on health and welfare, sick pay and holidays.

### 4. Joint letter of employees to the Union, June 14, 1965

On Monday, June 14, 1965, employee David Tingle, in collaboration with employee Jayne Casler, prepared a letter to Union Representative Turner as follows: 'The undersigned employees of Value Giant or Sonora Sundry Sales do request immediate return of their signed applications to Local 588 Retail Clerks Union A.F.L.C.I.O. and demand secret ballot procedures for selection of a bargaining agent.' This letter contains nine signatures; six were those of employees who had signed union membership applications. This was dispatched to the Union, and a copy was sent to Respondent on June 21, 1965.

### 5. Correspondence between Respondent and the Union

On June 15, 1965, Paul Kase, president of Respondent, sent a letter to Union Representative Turner advising him that 'the matter of the Union situation in our Value Giant Store in Sonora is currently being discussed with our Attorneys. We will contact you shortly.' On June 21, 1965, the Union, by James F. Alexander, its secretary-treasurer, wrote Kase as follows:

This is to acknowledge receipt of your letter dated June 15, 1965, to Jerry Turner, our area representative in Modesto.

In view of the fact that your Operations Manager of Value Giant Store in Sonora reviewed our authorization cards and confirmed that the Retail Clerks Union Local 588 represents a majority of the employees, we are requesting a meeting with you for the purpose of discussing a contract covering the employees of this store. We have set aside the following dates in order that we will be available for this meeting: June 28, 1965; June 30, 1965; July 6, 1965; or July 7, 1965.

We suggest that the meeting be held at 10:00 a.m. on one of the above mentioned dates in our office located at 915 Broadway, Sacramento.

We would appreciate a reply as soon as possible.

On July 1, 1965, the charge of refusal to bargain in the instant case was filed. On July 7, 1965 Kase wrote Alexander that Respondent had appointed Ray Vetterlein of Labor Relations Associates to represent it in this matter and suggested that the Union contact him.

On July 12, 1965 while Vetterlien was talking by telephone with Alexander on another matter, Alexander asked Vetterlein for the Respondent's position on the matter. Vetterlein replied that the recognition problem would have to be solved before they could get to bargaining.

\* \* \* \* \*

### 7. Solicitation of authorization cards

Union Representative Turner showed and gave to employees a copy of a form contract entitled 'Drug Industry Agreement.' He told them that this was the agreement that the Union would negotiate for with the employer. He told employees Janet Canfield and Billy Canfield that a majority of the employees had signed cards and that he had only one other person besides them to talk to."

these findings the trial examiner concluded that no unfair labor practice had been established and recommended that the complaint be dismissed. The Board disagreed.

### § 8(a) (1) Charge

The charge that respondent threatened its employees with a wage decrease if a union contract were to be executed is based upon the facts found by the trial examiner under his subheading "3. Speech of Russell Robinson, June 12, 1965." The trial examiner concluded that Robinson's remarks were protected under § 8(c) of the Act, 29 U.S.C. § 158(c).[3]

We agree. It is not a "threat of reprisal" for an employer to suggest that he will, if he signs it, adhere to the terms of a union contract. If those terms are disadvantageous it is the employer's right to make fair comment upon that fact and the employees' right to have him do so. Certainly a disadvantageous contractual provision cannot rationally be converted into an employer's threat of reprisal because the employer pointed it out. Statements of much greater antiunion intensity than this fall within § 8(c) protection. See NLRB v. TRW-Semiconductors, 385 F.2d 753 (9th Cir. 1967). See also Don The Beachcomber v. NLRB, 390 F.2d 344 (9th Cir. 1968).

### § 8(a) (5) Charge

The question here is whether in its refusal to accept the union authorization cards as establishing the union's majority status the employer entertained a good-faith doubt as to such status. The trial examiner concluded that it did. We agree.

On June 5, 1965, while the union was still engaged in soliciting membership, and before any recognition demand had been made, the company president, Kase, expressed his doubt that such cards as resulted would truly reflect representation desires of the employees. This doubt had two bases: (1) that the employees might well be intending to express only a wish for an election; (2) that they were apparently being misled as to the terms of the contract which would probably be signed if the union were made the bargaining agent. In no respect do the facts adversely reflect upon the good faith of Kase's doubts as they then existed. Later events demonstrated that in both respects the doubts were justified.

Whether the employer's conjecture that the authorization cards might be intended to express only a wish for an election is a sufficient basis for good-faith doubt of majority status we need not decide. Compare, e. g., NLRB v. Cumberland Shoe Corp., 351 F.2d 917 (6 Cir. 1965), with NLRB v. S. E. Nichols Co., 380 F.2d 438 (2d Cir. 1967). But when combined with the belief that the union was misrepresenting the terms of the anticipated collective bargaining agreement in order to procure the authorization cards, there was a sufficient basis for good-faith doubt that the cards represented a fair and free designation of the union as bargaining agent for the majority of the employees. In the face of such doubts the question of majority status encompasses more than the simple issue of the authenticity and number of signatures secured. The significance of the cards as representative of employee desires has become a relevant inquiry and accommodation must be made for its resolution. For these reasons the existence of such doubts as Kase entertained at the initial stage is justification for a refusal to accept the cards at face value until, with due dispatch, the truth is ascertained and the doubt resolved. Don The Beachcomber v. NLRB, supra.

The Board's opinion suggests that respondent had been committed to a duty to bargain by action of the store

---

3. "(c) The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit."

manager. It states: "We find, contrary to the trial examiner, that Finch, the highest official at the store, was clearly the respondent's agent with ostensible authority to acknowledge the union's majority status."

We cannot agree. Finch's lack of authority so to commit respondent was, on the very occasion of his action, communicated to union officials by respondent's attorney. Knowledge of lack of authority precludes the attaching of ostensible authority.

The Board emphasizes respondent's "delaying tactics" as reflecting upon the good faith of any doubt it may have entertained.

■ We wholly agree with the Board that respondent's delay in communicating the existence of its doubt and the basis for it, and in demanding an election, was inexcusable. Respondent should not, then, enjoy the benefit of employee change of mind occurring subsequent to the point at which it had a duty to act, either in recognition or in rejection of the union's showing. Retail Clerks Union, Local No. 1179, etc. v. NLRB, 376 F.2d 186 (9th Cir. 1967).

■ Respondent had no duty to act, however, until it had, without delay, ascertained the truth with respect to the doubt originally entertained. This occurred when, with knowledge of the fact that the contract discussed with them by union organizers was not the appropriate contract, the employees, by secret ballot, expressed their wish that representative status be ascertained by election rather than by card. From this point respondent was justified in its refusal to accept the cards as establishing representative status. International Ladies' Garment Workers' Union AFL-CIO v. NLRB, 366 U.S. 731, 81 S.Ct. 1603, 6 L.Ed.2d 762 (1966). Its doubts were than resolved by knowledge and good faith was no longer an issue upon which subsequent delay might relevantly bear. Id.

This does not excuse respondent's disregard of the union of which we continue to be highly critical. It does, however, dismiss such conduct from the ranks of unfair labor practices.

We conclude that upon the record as a whole there is a lack of support for the Board's order. Accordingly we decline to order its enforcement.