**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**LENKURT ELECTRIC COMPANY, Inc., Respondent.**

No. 24035.

United States Court of Appeals, Ninth Circuit.

Feb. 10, 1971.

Rehearing Denied April 2, 1971.

Browning, Circuit Judge, dissented and filed opinion.

**1104**

John D. Burgoyne (argued), Atty., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, John D. Burgoyne, Atty., N. L. R. B., Washington, D. C.; Roy O. Hoffman, Director, N. L. R. B., San Francisco, Cal., for petitioner.

Max Thelen, Jr. (argued), Frank B. Morgan, of Thelen, Marrin, Johnson & Bridges, Levy, Deroy, Geffner & Van Bourg, San Francisco, Cal., for respondent.

Before BROWNING and DUNIWAY, Circuit Judges, and TAYLOR *, District Judge.

TAYLOR, District Judge:

This case is presently before the Court upon the application of the National Labor Relations Board (hereinafter "the Board") for enforcement of its order issued on February 19, 1968, against the respondent Lenkurt Electric Company (hereinafter "the Company") pursuant to the provisions of Section 10(e) of the National Labor Relations Act, 29 U.S.C. § 160(e). The jurisdiction of the Board and of this Court is not in dispute.

The respondent Company is engaged in the design and manufacture of communications equipment for sale in interstate commerce. It maintains a manufacturing plant at San Carlos, California, and employs approximately 3,500 employees at the plant, of whom some 2,800 are represented by various unions. The remaining personnel are primarily supervisory and administrative personnel, engineers and other professional employees, and the employees in Department 83, the Publications Service Department. The employees in Department 83 prepare and publish the printed material which the Company ships with the products it sells.

On August 29, 1966, the Union [1] filed a representation petition with the Board seeking an election for certification as the bargaining representative of 14 unrepresented employees in the Publications Production Division of Department 83. These employees operated certain printing equipment used in the production and duplication of printed matter. After a representation hearing, the Regional Director for the Board ordered that an election be held on October 14, 1966. The election resulted in a rejection of the Union by a vote of 7 to 5, with two ballots being challenged. The Union thereafter filed an unfair labor charge and objections to certain conduct of the Company which allegedly affected the outcome of the election.

Briefly stated, the contentions of the Union, which the Board here seeks to uphold, are that in the two weeks imme-

---

* Hon. Fred M. Taylor, United States District Judge, District of Idaho, sitting by designation.

1. San Francisco & Vicinity Printing Pressmen Offset Workers & Assistants' Union No. 24, International Printing Pressmen and Assistants' Union of North America, AFL-CIO.

diately prior to the election, the manager of the printing department, one Kenneth Linka, made certain statements to groups of the printing department employees which restrained and coerced these employees in the free exercise of their rights under Section 7 of the National Labor Relations Act, thereby violating Section 8(a) (1) of the Act. The Company takes the position that Linka's statements were fair comment and permissible predictions of the consequences of unionization, and are protected under Section 8(c) of the Act.[2]

The unfair labor practice charge and the objections to the Company's conduct were consolidated for hearing before a trial examiner, who concluded that the Company had committed no unfair labor practice or otherwise objectionable acts, and recommended that the complaint be dismissed. The Board reversed, finding that the pre-election statements made by Linka, considered in the context in which they were made, constituted an implied threat that the Company would deprive its employees of certain benefits and employment, and would impose more rigid working conditions if the Union were elected as the employees' bargaining representative. The Board did not reject the findings and conclusions of the trial examiner, nor did it disturb his resolution of credibility of witnesses, except to the extent that the Board disagreed with

the inferences and legal conclusions to be drawn from the facts found.[3] We conclude, for the reasons hereafter set forth, that the petition of the Board for enforcement of its order should be denied.

It is well established law that an employer has the right to express opinions or predictions of unfavorable consequences which he believes may result from unionization. Such predictions or opinions are not violations of the National Labor Relations Act if they have some reasonable basis in fact and provided that they are in fact predictions or opinions rather than veiled threats on the part of the employer to visit retaliatory consequences upon the employees in the event that the union prevails.

The most recent and authoritative enunciation of the rule is found in N. L. R. B. v. Gissel Packing Co., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). The Supreme Court there set forth a clarification of the standards to be used in determining the impact of an employer's pre-election statements. The Court stated, 395 U.S. at 618, 619, 89 S. Ct. at 1942:

"Thus, an employer is free to communicate to his employees any of his general views about unionism or any of his specific views about a particular union, so long as the communications do not contain a 'threat of re-

2. Section 8(c) provides that:
"The expressing of any views, argument or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit."

3. The Board found no fault with the factual findings or resolutions of credibility by the examiner, but held that the witness Linka's own testimony supported the Board's inference that Linka's statements constituted implicit threat. We note that where a disagreement between the Board and the trial examiner does not turn upon questions of fact or upon the credibility of witnesses, but upon the inferences to be

drawn from the record as a whole, no special weight need be given to the conclusions of the trial examiner. Hawkins v. N.L.R.B., 358 F.2d 281 (7th Cir. 1966); Cheney California Lumber Co. v. N.L.R.B., 319 F.2d 375, 377 (9th Cir. 1963). The Board is free to accept the basic facts and credibility determinations and to draw inferences therefrom different from those drawn by the trial examiner. In such cases, however, the reviewing court will carefully examine the Board's findings, and overbearing evidence calling for inferences contrary to those of the Board must be considered controlling. Jervis Corp., Bolivar Division v. N.L.R.B., 387 F.2d 107 (6th Cir. 1967); N.L.R.B. v. Mt. Vernon Telephone Corp., 352 F.2d 977 (6th Cir. 1965).

prisal or force or promise of benefit.' He may even make a prediction as to the precise effects he believes unionization will have on his company. In such a case, however, the prediction must be carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences beyond his control or to convey a management decision already arrived at to close the plant in case of unionization. See Textile Workers v. Darlington Mfg. Co., 380 U.S. 263, 274, n. 20, 85 S.Ct. 994, 13 L.Ed.2d 827 (1965). If there is any implication that an employer may or may not take action solely on his own initiative for reasons unrelated to economic necessities and known only to him, the statement is no longer a reasonable prediction based on available facts but a threat of retaliation based on misrepresentation and coercion, and as such without the protection of the First Amendment. We therefore agree with the court below that '[c]onveyance of the employer's belief, even though sincere, that unionization will or may result in the closing of the plant is not a statement of fact unless, which is most improbable, the eventuality of closing is capable of proof.' 397 F.2d 157, 160. As stated elsewhere, an employer is free only to tell 'what he reasonably believes will be the likely economic consequences of unionization that are outside his control,' and not 'threats of economic reprisal to be taken solely on his own volition.' N. L. R. B. v. River Togs, Inc., 382 F.2d 198, 202 (C.A.2d Cir. 1967)."

We read this opinion as establishing two standards by which an employer's utterances may be objectionable. It appears clear that an employer may not make predictions which indicate that he will, of his own volition and for his own reasons, inflict adverse consequences upon his employees if the union is chosen. This would constitute a threat of retaliation. Also, an employer may not, in the absence of a factual basis therefor, predict adverse consequences

arising from sources outside his volition and control. This would not be a retaliatory threat, but would be an improper restraint nevertheless. N. L. R. B. v. C. J. Pearson Co., 420 F.2d 695 (1st Cir. 1969). Thus, an employer may not impliedly threaten retaliatory consequences within his control, nor may he, in an excess of imagination and under the guise of prediction, fabricate hobgoblin consequences outside his control which have no basis in objective fact.

With these basic premises in mind, we turn to an evaluation of the Company's communications to its employees in the instant case. The record reflects that in his conversations with the printing department employees, Linka suggested that if the employees were to unionize, it was possible that a more strict regimentation of working hours would be implemented. He explained that under the present working conditions, company policy with respect to coffee breaks, lunch hours and conversation while working had been fairly casual in the printing department, while in the unionized departments of the plant the employees were strictly controlled as to coffee breaks, lunch hours and general attention to their labors. Linka further explained that if these employees were unionized, and the basis of their compensation changed from monthly salary to the hourly rates which were the basis for compensation of other union employees in the plant, a more strict observance of working time would probably result. These observations were based largely on Linka's own observations when other employees in the plant were unionized and had gone to an hourly basis of compensation.

Linka further suggested that working conditions might be made more difficult by unionization because the Company might seek to reduce operating costs by using less expensive paper stock in the printing department. He explained that while the employees usually worked with "premium stock" paper, that if it were necessary to reduce costs he would probably introduce lower quality stock, which

might cause more problems for the operators of the various machines.

In the course of the meetings, Linka also stated that sick leave and other fringe benefits, particularly the company's policy of providing working smocks and laundry service to the employees, might be changed by unionization. With respect to sick leave, Linka explained at the hearing that it was his understanding that employees with the International Brotherhood of Electrical Workers Union, which represented most of the employees in the plant, did not get paid if they did not come to work. The possibility of discontinuing the laundry service and working smocks was described as potentially necessary to reduce costs and to "remain competitive."

The Board also found an unfair labor practice in Linka's statements to two female employees to the effect that their lack of diversified experience in operating the printing machines might work to their disadvantage in the event of unionization. It appears that these women had limited ability in the print shop and could operate only one or two of the machines. It had been company policy in the past, when these machines broke down or when work was slack, to move these women to other departments in the plant in order to fill out their work day. Linka told these women that from his observation of union shops, unions were adverse to temporary transfer of employees outside their primary department, and in the event that the print shop were unionized and work was slow in the printing department, the Company might be unable to send these women out to work in other departments in order to obtain a full day's time. Linka further pointed out that it might be necessary, if these women were unable to work in other departments, to lay them off temporarily during those periods when they were unable to work in the printing department.

We find, contrary to the Board, nothing in these expressions by the Company's supervisor to constitute either an express or implied threat of retaliatory action by the Company. In determining whether an employer's communications constitute permissible argument or prohibited threats, the statements must be considered in the context of the factual background in which they were made, and in view of the totality of employer conduct. N. L. R. B. v. Virginia Electric & Power Co., 314 U.S. 469, 62 S.Ct. 344, 86 L.Ed. 348 (1941); P. R. Mallory & Co. v. N. L. R. B., 389 F.2d 704 (7th Cir. 1967). The record reveals no background of antiunion animus on the part of the Company nor on the part of Linka. Virtually all the employees of the respondent Company were already represented by union bargaining representatives except supervisory and professional personnel and the printing department, and there is nothing whatever in the record to indicate that the Company was adamantly opposed to the advent of the Pressmen's Union. The record clearly shows that Linka had been on friendly terms with the employees in the printing department, had been a union member in the past, and had known most of the employees in the printing department for some years. Moreover, the record is persuasive that the Company and Linka studiously avoided any campaign against the union until the last two weeks preceding the election, that the employees themselves had on several occasions approached Linka of their own accord to obtain his views on the prospective unionization, and that the meetings were held, at least in part, in response to requests by the employees. On the basis of the record, we are convinced that there was no implied or expressed threat of retaliation by Linka, but that his statements were at most predictions of possible disadvantages which might arise from economic necessity or because of union demands or union policies. Don The Beachcomber v. N. L. R. B., 390 F.2d 344 (9th Cir. 1968); N. L. R. B. v. Sonora Sundry Sales, Inc., 399 F.2d 930 (9th Cir. 1968); N. L. R. B. v. TRW–Semiconductors, Inc., 385 F.2d 753 (9th Cir. 1967); N. L. R. B. v. Laars Engineers, Inc., 332

F.2d 664 (9th Cir. 1964); Automation & Measurement Division, The Bendix Corp. v. N. L. R. B., 400 F.2d 141 (6th Cir. 1968); N. L. R. B. v. Golub Corp., 388 F.2d 921 (2d Cir. 1967); P. R. Mallory & Co., Inc. v. N. L. R. B., *supra*.

■ There remains the question of whether the predictions made by Linka had any "basis in objective fact." We conclude that there was such a factual basis for all the predictions made. The suggested necessity of eliminating the smock and laundry service and of using a lower grade of paper stock arose out of anticipated higher wage costs. The Union had, as part of its campaign, given the employees a copy of the then current contract for the Pressmen's Local No. 24, which clearly indicated that such a contract would increase the Company's costs. The statements regarding sick leave and more strict accounting of employees' time were based primarily on prior union contracts with other unions in the plant, and on Linka's own experience and observations of the results of prior union organizations.[4] The predicted difficulty in transferring employees among departments was based on his own prior experience as a union member and on his observations of union shop printing operations in the area.[5] On this record, we hold that each of the challenged statements was founded on objective facts, and that the predictions advanced by Linka were, under all the circumstances, demonstrably probable consequences which might be anticipated as the result of unionization.

■ The Supreme Court and this circuit are committed to the principle that debate in union campaigns should be vigorous and uninhibited, subject to the limitations we have heretofore set forth. Linn v. United Plant Guard Workers, 383 U.S. 53, 62, 86 S.Ct. 657, 663, 15 L. Ed.2d 582 (1966); N. L. R. B. v. TRW–Semiconductors, Inc., *supra*. The exercise of free speech in these campaigns should not be unduly restricted by narrow construction. It is highly desirable that the employees involved in a union campaign should hear all sides of the question in order that they may exercise the informed and reasoned choice that is their right. Colonial Corporation v. N. L. R. B., 427 F.2d 302 (6th Cir. 1970); N. L. R. B. v. TRW–Semiconductors, Inc., *supra*; P. R. Mallory & Co. v. N. L. R. B., *supra*. The statements of Linka do not justify the strained interpretation given them by the Board, but were within the protection of the free speech provisions of the First Amendment, as implemented by Section 8(c) of the National Labor Relations Act. N. L. R. B. v. Laars Engineers, Inc., *supra*.

The petition for enforcement of the Board's order is denied.

BROWNING, Circuit Judge (dissenting):

The majority has undertaken to perform a function of the Board: namely, the accommodation of the employees' right of association and the employer's right of communication, and, as part of that task, the evaluation of the impact upon employees of particular employer statements in a particular management-labor context. In discharging the Board's function, moreover, the majority has failed to afford employees the protection from coercive employer-statements mandated by Gissel Packing Co. v. N. L. R. B., 395 U.S. 575, 616–620, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969).

4. Where an employer's predictions relate to consequences which are likely to occur because of union activity, it is proper for him to base his opinion or prediction on past events or personal experiences, if these are truthfully depicted. P. R. Mallory & Co. v. N.L.R.B., *supra*, 389 F.2d at 707, n. 2.

5. Similar prediction of adverse consequences to employees arising out of union objection to such interdepartmental transfers was held to be permissible prediction in Suprenant Mfg. Co. v. N.L.R.B., 341 F.2d 756 (6th Cir. 1965). Cf. also, Russell-Newman Mfg. Co. v. N.L.R.B., 370 F.2d 980 (5th Cir. 1966), where prediction that the employer might have to discontinue its voluntary make-work policies during slow seasons was upheld as permissible argument.

Labor Board findings within the Board's specialized field "carry the authority of an expertness which courts do not possess and therefore must respect." Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951). The determination challenged here falls in this category. "[A] reviewing court must recognize the Board's competence in the first instance to judge the impact of utterances made in the context of the employer-employee relationship." Gissel, *supra*, 395 U.S. at 620, 89 S.Ct. at 1943.[1] "[T]he expertise of the Board is particularly relevant to the determination of whether a latent threat lies hidden in the words of an employer." Mon River Towing, Inc. v. N. L. R. B., 421 F.2d 1, 9 (3d Cir. 1969). *See also* N. L. R. B. v. General Industries Electronics Co., 401 F.2d 297, 300 (8th Cir. 1968); Dubin-Haskell Lining Corp. v. N. L. R. B., 375 F.2d 568, 571 (4th Cir. 1967); Daniel Construction Co. v. N. L. R. B., 341 F.2d 805, 811 (4th Cir. 1965); *cf.* Conolon Corp. v. N. L. R. B., 431 F.2d 324, 327–28 (9th Cir. 1970).

But if it were not within the Board's special competence to determine whether Linka's statements conveyed an implied threat to employees, it would still be improper for a reviewing court to displace the Board's "choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." Universal Camera Corp., *supra*, 340 U.S. at 488, 71 S.Ct. at 465; Suprenant Manufacturing Co. v. N. L. R. B., 341 F.2d 756, 760 (6th Cir. 1965). *See also* N. L. R. B. v. Miller Redwood Co., 407 F.2d 1366, 1369 (9th Cir. 1969). A brief consideration of the law and the facts will demonstrate that, at a minimum, the Board made such a choice in this instance, albeit not the choice the majority prefers.

## I

Accommodating the employer's right to speak with the employees' right to associate presents troublesome problems. The balance has shifted often as Congress, the Board, and the courts have adjusted to changing values and conditions in industrial-labor relationships.

Initially, the Board required employers to maintain strict neutrality. "This approach was based on the belief that an employer's statements could not be divorced from his position of economic power over his employees, so no matter how innocent the speech itself, the employees would be under pressure to follow the express desire of their employer." Restrictions on the Employer's Right of Free Speech During Organizing Campaigns and Collective Bargaining, 63 Nw.U.L.Rev. 40, 43–44 (1968). "The Board reasoned that the choice of a bargaining representative was the workers' exclusive concern, in which the employer had no more interest than the employees would have in participating in the choice of the company's board of directors." Cox & Bok, Labor Law Cases and Materials 170 (7th ed. 1969).

In 1941, the decision in N. L. R. B. v. Virginia Electric & Power Co., 314 U.S. 469, 62 S.Ct. 344, 86 L.Ed. 348 required recognition of the employer's First Amendment right of free speech. That ruling "abolished the assumption that the employer's position made his expressions in the organizing context coercive per se," 63 Nw.U.L.Rev., *supra* at 44. The Board could still regulate employer speech, but only as part of a totality of employer activities that "restrain or coerce his employees in their free choice." 314 U.S. at 477, 62 S.Ct. at 348.

In 1947, Congress reaffirmed the employer's right to comment on union organizational efforts by adding section

1. In NLRB v. Sinclair Co., 397 F.2d 157, 161 (1st Cir. 1968), one of the three consolidated cases disposed of in the *Gissel* opinion, the Court of Appeals said,

"Whether an employer has used language that is coercive in its effect is a question essentially for the specialized experience of the Board."

8(c) to the National Labor Relations Act. *See* Linn v. United Plant Guard Workers of America, Local 114, 383 U.S. 53, 62, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966). And by the early 1950's "the Board began to give greater latitude to employer speeches * * *," A trend that continued thereafter though ameliorated somewhat by changes in Board membership subsequent to 1961. Cox & Bok, *supra* at 176, 177.

During this period—the 1960's, immediately preceding the decision in *Gissel* —Professor Cox and Dean Bok, among others, suggested that the prevailing rule (which prohibited employer "threats" during organizational campaigns, but permitted "predictions") unduly inhibited the free exercise of the employees' right to associate. Professor Cox wrote, "The lower value which the NLRB now puts upon freedom of association and the notion that an employer has a legitimate interest in defeating a union have led to increasing the latitude allowed employers in the name of free speech to the point where a clever lawyer can readily show an employer how to threaten and coerce his employees without fear of NLRB proceedings. An employer may not lawfully 'threaten' to reduce wages or close a plant if a union is organized but he may 'predict' that these things will happen." Cox, Law and the National Labor Policy 42–43 (1960). And Dean Bok: "In principle, the policy was sound enough, for when the employer simply pointed out the adverse consequences which might lawfully result from unionization he provided the employees with information that was clearly pertinent to the decision they were called upon to make. In practice, however, the policy gave hostile employ-

ers great leeway to indulge in dire predictions in order to dissuade the employees from supporting the union." Bok, The Regulations of Campaign Tactics in Elections under the National Labor Relations Act, 78 Harv.L.Rev. 38, 75 (1964).[2]

There were other complaints.

The point was made that it was difficult to administer the prohibition against fabrication or exaggeration of economic consequences of unionization, such as a plant shutdown or loss of business, because the factors involved were often complex, conflicting, and speculative, and the ultimate decision generally a matter of subjective judgment. "As a result, the Board could rarely disprove the employer's predictions," without an unjustifiable expenditure of agency resources. 78 Harv.L.Rev., *supra* at 81.

It was argued that the rule that "total context" determines whether employer statements are coercive "places both unions and employers in a position of uncertainty as to what may properly be said during the pre-election campaign," and there was a need for "definite guidelines." Cuneo, NLRB's Totality of Conduct Theory in Representation Elections and Problems Involved in Its Application, 7 Duquesne L.Rev. 229, 238, 242, 244 (1968).

## II

The section of the *Gissel* opinion that deals with the employer-speech issue is an apparent effort to restate and restructure governing doctrine to meet complaints of this kind.[3] Although the remedies adopted by the Court were not invariably those suggested by the critics, "[i]t seems demonstrable that the appli-

2. Both writers made the point that the economic dependence of the employee conditioned his reaction to the employer's words. Professor Cox: "Arguments which disclose the speaker's strong desire are not wholly an appeal to reason if the listener is in the speaker's power" (42). Dean Bok: It is "the power that [the employer] holds over the livelihood of his employees * * * which distinguishes

him from the ordinary speaker and justifies special limitations on his right to communicate" (70).

3. Of course, the Court was aware of the relevant legal literature. The publications of Professor Cox and Dean Bok referred to in the text are cited in the *Gissel* opinion, *see* 395 U.S. at 619, 620 n. 35, 89 S.Ct. 1918.

cable rules governing employer speech have been greatly altered by that case." Browne & Sachs, The Suppression of Employer Free Speech—A New Ban on "Conscious Overstatements," and a Caveat Against Brinksmanship, 15 Vill.L. Rev. 588, 599 (1970).

It should be emphasized that *Gissel* did not involve an express threat of retaliatory action—such overt coercion is rare.[4] Indeed, Mr. Sinclair, the employer, had assured his employees that he "would not close the plant in retaliation for employees voting for a union." 15 Vill.L.Rev., *supra* at 605. The question in *Gissel*, as in this case, was whether, despite the absence of an express threat, the Board could reasonably conclude that the employer's statements would be understood by the employees not as bona fide predictions of economic consequences of unionization beyond management's control, which they purported to be, but rather, in reality, as notice of changes that management might choose to make if the employees chose the union.

At the outset, *Gissel* rejected any notion that during an organizational campaign the employer is free to confront his employees with the "uninhibited, robust and wide open" speech appropriate in other contexts. On the contrary, "in the context of a nascent union organizational drive," the Court held, "employers must be careful in waging their antiunion campaign" (395 U.S. 616, 89 S.Ct. 1941). "[A]n employer's rights cannot outweigh the equal rights of the employees to associate freely * * *. And any balancing of those rights must take into account the economic dependence of the employees on their employers, and the necessary tendency of the former, because of that relationship, to pick up intended implications of the latter that might be more readily dismissed

by a more disinterested ear" (617, 89 S.Ct. 1942). A vote on union recognition is not comparable to "the election of legislators or the enactment of legislation * * * where the independent voter may be freer to listen more objectively and employers as a class freer to talk" (618, 89 S.Ct. 1942).

The Court then formulated specific standards for evaluating the impact of employer statements during a union organizational campaign.

An employer may freely state "his general views about unionism or any of his specific views about a particular union" subject only to the general statutory interdiction of "threat of reprisal or force or promise of benefit" (618, 89 S.Ct. 1942).

A stricter standard applies, however, to an employer's "prediction as to the precise effects he believes unionization will have on his company" (*Ibid.*). And for good reason. As Professor Cox and Dean Bok had pointed out, an employer's forecast as to future working conditions of employees of his own business in the event of unionization is a ready vehicle for conveying the message that the employer does not care to deal with the union, and that if his employees are so unappreciative as to compel him to do so, he is likely to return the unkindness. Accordingly, the risk is high that employees will understand an employer's predictions of such changes as a threat to bring them about.

The standard that the Court devised to assure that employer predictions of adverse consequences of unionization would not carry an implication of retaliation is this: "The prediction must be carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences beyond his control" (618, 89 S.Ct. 1942).[5]

---

4. "Today the employer seldom engages in crude, flagrant derelictions. Nowadays it is usually a case of more subtlety, perhaps the more effective, and certainly the more likely to escape legal condemnation."

NLRB v. Neuhoff Bros., Packers, Inc., 375 F.2d 372, 374 (5th Cir. 1967).

5. The Court added, "or to convey a management decision already arrived at to

By requiring that the employer's forecast be based upon "objective facts," from which it appears that the predicted event is a "demonstrably probable consequence" of unionization, and one that is "beyond [the employer's] control," the Court established clear, largely objective criteria that virtually assure that a permitted prediction will reflect the bona fide judgment of the employer regarding the effects of unionization itself. It is implicit in *Gissel* that if an employer prediction does not meet these criteria the risk that it will have a coercive impact upon employees is so high as to justify prohibiting the employer from making it.

The Court imposed one additional restriction upon employer predictions—one of form rather than substance: they must be "carefully phrased * * * to convey an employer's belief" in terms of the substantive criteria. The purpose of this requirement is to assure that the *hearer* will *know* that the employer's statement is a bona fide prediction and not a threat, for the critical consideration is the impact of the statement upon the employees.

### III

The Board summarized the statements of Linka, the employees' supervisor, challenged in this case, as follows:

"[H]e told them, either directly or by clear implication, that if they selected the Union, their coffee breaks and lunch hours would be tightly controlled, their conversations during working hours would be restricted, the Respondent would stop providing smocks and laundry service for employees, and would run lesser grade paper stocks, which would make operating the presses more difficult. In addition, Linka told employees that under a union shop they would not en-

close the plant in case of unionization. *See* Textile Workers v. Darlington Mfg. Co., 380 U.S. 263, 274, n. 20, 85 S.Ct. 994, 13 L.Ed.2d 827 (1965)," to provide for the special situation dealt with in the cited case.

joy present sick leave benefits, and would not be paid when time was lost due to sickness. Linka also admitted telling two employees, Brown and Birtwell, that their limited abilities could disqualify them for work in a union shop, because when the Union came in, employees would have to operate all presses, and those who could not might be replaced by other operators from the union hall. In addition, Linka told Birtwell that if the Respondent wanted to rehire her, but found people at the hiring hall who could do better work, she would not be rehired and would forfeit her pension." (Footnotes omitted.)

The Board noted that the statements were made at a series of a dozen or so meetings held in Linka's office during the two-week period immediately preceding the election. Each meeting was attended by three or four of the fourteen employees of the unit—each employee attending three or four meetings. As the Board observed, "systematic interviews for the purpose of exposing employees to antiunion propaganda not dissimilar to those conducted by Linka have been held inherently coercive and grounds for setting aside an election." [6] Although the Board did not rest its decision upon these circumstances, it did rely upon them, noting that "evaluation of Linka's remarks requires consideration of the context in which they were made." The Board continued:

"The clear import of his statements concerning coffee breaks, lunch periods, sick leave, possible loss of jobs, regimentation, etc., was that present benefits would be endangered or diminished with the advent of the Union. Coming from Linka who had been employed by Respondent for 15 years and was manager of the unit in which the election was directed these refer-

6. Citing General Shoe Corp., 97 N.L.R.B. 499, 501–02; Economic Machinery, 111 N.L.R.B. 947; The Great Atlantic & Pacific Tea Co., 140 N.L.R.B. 133, 134–35.

ences concerning steps that could be taken by management in the event the Union was certified would quite naturally be given great weight by the employees. Accordingly, whether they be viewed as predictions or expressions based upon Linka's experience with unions, his statements were reflective of restrictions Respondent was in a position to invoke if the employees designated the Union. 'It is well settled that an employer's "prediction" of untoward economic events may constitute an illegal threat if he has it within his power to make the prediction come true.' And as 'the likely import of respondent's pronouncements was coercive,' and calculated to dissuade employees from supporting the Union in the impending election, the impact of Linka's repeated threats upon employee freedom of choice cannot be dismissed as isolated or because not shown to have been motivated by antiunion animus. Accordingly, we find * * * that Respondent * * * violated Section 8(a) (1) of the Act." (Footnotes omitted.)

This evaluation of Linka's remarks is a rational choice on the record, particularly in light of the subsequent decision in *Gissel*.

The challenged statements predicted that the union would make certain demands, the company would grant them, and granting the demands would impose hardships upon the employees who had chosen the union to represent them. All of the predicted hardships related to matters within the employer's control—the rigid enforcement of working rules, elimination of sick leave, use of inferior raw materials, curtailment of free supplies and services furnished to employees, and the discharge and rehiring

of employees. These are precisely the sort of forecasts that employees would understand as describing changes management itself intended to impose if the union won.[7]

The question is whether the Board could reasonably conclude that they were not stated in terms of objective facts sufficient to demonstrate that the predicted events were probable consequences of unionization beyond the employer's control and thus negative the natural inference of employer retaliation.

### A.

Linka's prediction that "possibly their sick leave would be changed, and as far as coffee breaks, lunch hour, regimentation of the shop, that would be enforced," was based upon "what I had observed down in Building 4"—the company's main factory unit, employing unionized labor. As to sick leave, Linka added, "[T]he arrangement had been that it was up to the department manager's discretion * * * to approve a leave of absence up to five days with pay. My understanding of the Union was that if you didn't come to work you didn't get paid for it." Linka testified that in referring to "the Union" he meant the IBEW, which represented the bulk of the factory unit workers. The Company asserts that the underlying factual basis of these predictions was that the Pressmen's Union,[8] involved here, would negotiate a contract changing the basis of pay from monthly salary to an hourly scale, as in the IBEW contract.

As the Board points out, the sample contract that the Pressmen's Union circulated did not provide an hourly scale but a weekly salary and, further, it did provide sick leave. Faced with these

---

7. *See* Santa Fe Drilling Co. v. NLRB, 416 F.2d 725, 728 (9th Cir. 1969); NLRB v. Dow Chem. Co., 420 F.2d 480, 482 (5th Cir. 1969); NLRB v. Mink-Dayton, Inc., 416 F.2d 327, 328–329 (6th Cir. 1969); NLRB v. Wylie Mfg. Co., 417 F.2d 192, 194–195 (10th Cir. 1969); NLRB v.

Varo, Inc., 425 F.2d 293, 300 (5th Cir. 1970).

8. San Francisco & Vicinity Printing Pressmen, Offset Workers & Assistants' Union No. 24, International Printing Pressmen and Assistants' Union of North America, AFL-CIO.

patent inconsistencies between the asserted basis for Linka's prediction and the most obviously relevant facts, the employees would naturally infer that the real cause of the predicted changes was to be a retaliatory decision by management. Moreover, even if the conjectured change to an hourly pay scale had been a demonstrably probable consequence of unionization beyond the Company's control, no one explained why this change would in turn compel the elimination of sick leave and the introduction of employee regimentation.

### B.

The reason Linka gave for his predictions that he, Linka, would probably eliminate free work smocks and laundry service for the employees and shift to the use of lower-grade paper stock, which was more difficult for the employees to handle, was that the union would demand and obtain higher wages and these economies then would be necessary to permit the company "to remain competitive."

It could hardly escape the listening employees that the hardships that would befall them in the event of unionization were described with great precision and specificity, but the cause of those calamities was identified only vaguely and in most general terms. Nothing that Linka said approached the leval of objective fact sufficient to demonstrate that the predicted hardships were probable consequences of unionization beyond the company's control. There is little anywhere in the record to demonstrate that the Printing Union's as yet unannounced demands would substantially enhance the company's costs. *See Gissel, supra,* 395 U.S. at 619, 89 S.Ct. 1918. Even if there were, there is nothing to demonstrate that the company "could not, in fact, meet higher labor costs out of current levels of income, or out of increased income, or from reduced costs in other areas." Mon River Towing, Inc. v. NLRB, *supra,* 421 F.2d 1, 11 (3d Cir. 1969). Finally there were no facts bearing upon the "competitive" conditions that the company was required to meet.

### C.

Linka's most serious prediction was that employees Brown and Britwell would lose their jobs if the union won. Linka's testimony as to these statements was as follows:

"In explaining this to [Wanda] Brown and [Eleanor] Birtwell, I told them that I felt they were specialized in what they could do. If the plant were to go union and I needed an operator on one of these other presses, and I didn't feel they could operate it * * * I would be compelled to say, 'Go home,' and I would have to call the Union hall and get somebody who could. This is what I explained to them.

 * * * * * *

* * * In Wanda's and Eleanor's cases, being more or less specialized in the equipment they operated, * * * in the event there was a union, and I couldn't use her on another job or another press if the work should slow down on hers, or couldn't move her into another department that wasn't an hourly-type operation, it was conceivable that she would be laid off. * * *

 * * * * * *

I also explained to [Eleanor Birtwell] that if things were slow at Lenkurt for any period of time and she would go out to another job and we wanted to bring her back and we found somebody else out of the hall that would probably do her job a little better, she would foreit her pension if there wasn't a spot with Lenkurt.

In *Gissel* the Supreme Court approved the principle "that '[c]onveyance of the employer's belief, even though sincere, that unionization will or may result in the closing of the plant is not a statement of fact unless, which is most improbable, the eventuality of closing is capable of proof.'" *Gissel, supra,* 395

U.S. at 618–619, 89 S.Ct. at 1942. The Court noted that employees are particularly sensitive to threats of plant closure. *Ibid.* at 619–620, 89 S.Ct. 1918. There would seem no reason to believe, however, that employees are not equally sensitive to threats of loss of employment and (as in Birtwell's case) loss of pension rights as well.[9]

Linka offered nothing approaching proof of these predictions. Again, while the evil Linka prophesied was clear and specific, the factual justification was vague and general.

The company suggests that Linka intended to convey the thought that the *Printing Union* would not permit its employee members to shift to other presses within the printing unit or to odd jobs in other departments. It would seem improbable that a union elected to represent fourteen employees in one small department of a company having a 3500-man work force would impose either condition.[10] The company does not suggest that the sample contract circulated by the Printing Union purported to do so.

The point, again, is not simply that Linka's statements were insufficiently supported by objective facts, but rather that the Board could conclude that because of this lack of objective factual support there would be a natural tendency for the employees to take the statements as a threat.

Finally, neither the company, nor the majority, attempts to justify Linka's final prediction that Birtwell would not be rehired if the company found someone else "a little better."

The Board's order should be enforced.

9. Eleanor Birtwell was 56 or 57. She would become eligible for benefits under the company's pension plan at 62.

10. Suprenant Mfg. Co. v. NLRB, 341 F.2d 756, 759–760 (6th Cir. 1965), relied upon by the company, is not to the contrary.

The collective bargaining contract appears to have been plantwide, including a number of departments, and to have contained provisions restricting interdepartmental transfers. 341 F.2d at 759; 144 N.L. R.B. at 513–14.